Nancy ULLOA, Plaintiff,

v.

AMERICAN EXPRESS TRAVEL RE-
LATED SERVICES COMPANY, INC., a
Florida Corporation, Defendant.

No. 92–1142–CIV.

United States District Court,
S.D. Florida.

May 25, 1993.

Madeline Buchanan Auerbach, Rodolfo Go-
mez, Hogg, Allen, Norton & Blue, P.A., Coral
Gables, FL, for defendant.

Richard M. Weiner, Sugarman & Susskind, P.A., Miami, FL, for plaintiff.

## MEMORANDUM OPINION AND ORDER

HIGHSMITH, District Judge.

THIS CAUSE comes before the Court upon the conclusion of a two-day non-jury trial that commenced on May 17, 1993. The Court heard the testimony of numerous witnesses and examined a large number of letters and business documents. The Court has considered all of the evidence and now makes the following findings of fact and conclusions of law.

### FINDINGS OF FACT

(1). Plaintiff Nancy Ulloa is a resident of Dade County, Florida.

(2). Defendant American Express Travel Related Services, Inc. ("American Express") is engaged in an industry affecting commerce and employing over fifteen (15) employees for twenty (20) or more weeks during the year, within the meaning of Title VII, 42 U.S.C. § 2000e(b).

(3). Ulloa was hired by Defendant American Express Travel Related Services, Inc. ("American Express") to fill the position of Customer Service Representative II on or about May 12, 1987. In this position, Ulloa was responsible for reviewing and analyzing correspondence from cardmembers. If a problem was spotted, she would attempt to make an on-line adjustment to resolve the problem.

(4). On November 21, 1988, Ulloa was promoted to Customer Service Representative I. Employees in this position perform the same basic duties as the lower-level customer service representatives, but these duties are performed by more experienced personnel with a higher level of proficiency.

(5). All customer service representatives are part of the customer service department of American Express.

(6). Ulloa was provided with several salary and merit increases and performance awards during the course of her employment with American Express. Specifically, Ulloa was the recipient of the "Star Performer Award" for the months of October and December, 1990, and February, March and April, 1990. (Plaintiff's Exhibit #13). In addition, she received salary increases in August, 1989, and in September, 1990.

(7). In August, 1990, Ulloa received a performance appraisal from Lorrayne Alicea and Jose Vidal. (Defendant's Exhibit B). In this appraisal, Ulloa was recognized for doing quality work, and she was expressly praised for being the most productive employee in the unit. She was criticized, however, for not addressing a persistent problem with daily attendance. In addition, Ulloa received two warnings for on-the-job soliciting (selling cookies for her daughter and clothes for a relative).

(8). The Court finds that Ulloa was a top-quality employee for American Express. Although she committed a few minor rule infractions, she consistently was the most productive employee in her department.

(9). American Express provides its employees with medical, personal, and family leaves of absence. Maternity leave is treated similarly to all other types of medical leave. These leave plans provide for paid and unpaid leaves of varying length. American Express also provides a short-term salary compensation plan known as the "Salary Continuation Plan." The salary continuation leave plan provides for various degrees of salary compensation for up to six months. American Express does not guarantee reinstatement for any employee on any leave of absence if their leave, whether medical, maternity, personal or family, extends beyond twelve weeks. If the employee returns within a twelve-week period, then American Express guarantees reinstatement to the same or a similar position.

(10). On June 3, 1991, Ulloa commenced a leave of absence associated with her pregnancy.

(11). Ulloa testified that prior to her leave of absence, she was never notified about the twelve-week reinstatement policy. Lorrayne Alicea, Ulloa's supervisor, however, testified that she met with Ulloa prior to June 3, 1991, to discuss all of the company's leave of absence policies and procedures, including reinstatement. This Court finds the testimony of both witnesses to be credible,

but the Court finds that Lorrayne Alicea's description of her meeting with Ulloa is more credible than Ulloa's proffer that there was no meeting. The Court finds that Ulloa was told about the reinstatement policy, although she honestly may have forgotten about this meeting in the succeeding months.

(12). A few days later, Ulloa received a letter, dated June 11, 1991, from Mialagros Conner, American Express' Manager of Benefits and Employee Activities. The letter advised Ulloa that she was scheduled to return to employment from her leave of absence on July 30, 1991, and that she was eligible for salary continuation until November 15, 1991. The letter also informed Ulloa that she would be eligible for an unpaid medical leave of absence if she was still medically unable to return to work on November 15, 1991. The letter expressly states, however, that:

### REINSTATEMENT

In order to be eligible for reinstatement, the combined total leave (including Salary Continuation period, if any) must not exceed 12 weeks.

(13). The Court finds that this letter clearly advised Ulloa that she would not be guaranteed reinstatement unless she returned to American Express within twelve weeks of June 3, 1991. The Court also finds that this requirement is unambiguous because it expressly applies to all leave policies, including maternity leave and the salary continuation plan. Therefore, in light of Ulloa's receipt of the June 11, 1991 letter and her meeting with Lorrayne Alicea to discuss leave of absence policies, the Court finds incredible any claims by Ulloa that she was not aware of the existence or applicability of the reinstatement policy as outlined in the letter of June 11, 1991.

(14). Ulloa's daughter, Amanda Ulloa, was born on June 19, 1991. During the course of the delivery, Doctor Jorge Vallejo performed a radial episiotomy upon Ulloa to assist in the delivery of the baby because of the baby's large size.

(15). Ulloa experienced acute pain and discomfort in the weeks following the delivery. The doctor advised Ulloa that she should not return to work until mid-September. Ulloa advised American Express of this

development, and Ulloa was told that she could return to work on September 9, 1991.

(16). On or about August 8, 1991, Mialagros Conner sent another letter to Ulloa requesting Ulloa's signature on a form entitled Salary Continuation Verification, and requesting a handwritten signature from Doctor Vallejo on a form entitled Attending Physician's Statement of Disability. In the letter, Conner informed Ulloa that her expected date of return to work had been recalculated to August 20, 1991. The letter did not inform Ulloa that an extension of her return date until September would result in the loss of guaranteed reinstatement privileges.

(17). Ulloa signed the Salary Continuation Verification form and provided the Attending Physician's Statement of Disability to Doctor Vallejo.

(18). On August 27, 1991, Ulloa visited American Express with her husband and two daughters to meet with Conner to complete paperwork associated with a loan that Ulloa borrowed against her incentive savings plan. At no time during that meeting was Ulloa warned that she would be subject to termination because her leave of absence was about to extend beyond twelve weeks.

(19). After meeting with Conner, Ulloa met briefly with Jose Vidal, a Customer Services Manager and Ulloa's direct supervisor, to ascertain when she should return to work on Monday, September 9, 1991. Vidal instructed her to call him on the Thursday or Friday preceding September 9, 1991.

(20). On Friday, September 6, 1991, three days prior to the date upon which Ulloa was scheduled to return to work, Margarita Moore, the Manager of Human Resources, notified Ulloa that she should not report to work because her position had been eliminated due to budgetary constraints. Later that afternoon, William Hyland, the Vice-President of the Personnel Department, met with Ulloa and advised her that there were no other positions of employment available at American Express.

(21). Jose Vidal credibly testified about the business conditions at American Express prior to Ulloa's termination. During the six month period preceding Ulloa's termination,

the customer service department experienced a decrease in the volume of cardmember correspondence. American Express had recently offered its customers a "1–800" telephone number and encouraged cardmembers to call in their inquiries instead of writing to the company. This resulted in a lower volume of incoming mail to the customer service department. Accordingly, American Express decided to reduce the staff of the department.

(22). The decision to eliminate a position from the customer service department was reached in July or August during the preparation of the customer service department's budget. American Express does not have a specific policy to determine which employees get terminated when the company decides to reduce implement a staff reduction. In this instance, Ulloa was terminated because she exceeded the twelve-week reinstatement limit. In other words, she was not guaranteed a position upon her return from her leave of absence, so American Express decided to terminate Ulloa. If she had not exceeded the twelve-week reinstatement period, then she would have been guaranteed a job upon her return to American Express. In that instance, according to the credible testimony of Jose Vidal, a combination of two factors, seniority and productivity, would have been utilized to determine which employee would be terminated.

(23). Other individuals employed in the customer service department were retained, even though they had less seniority and lower levels of productivity than Ulloa. No other positions were offered to Ulloa. This is because Ulloa was not qualified for any open position at American Express at the time of her termination.

(24). In 1991, there were approximately 350 employees at the American Express center in Miami Lakes, Florida, where Ulloa was employed as a customer service representative. Seventy-five percent of these employees were female. In the customer service department, all of the customer service representatives were female. Several dozen women in this facility have taken maternity leaves, either prior to or subsequent to Ulloa's termination, and all of these employees who returned within twelve weeks were reinstated. Several employees took leave of absences exceeding twelve weeks. In those instances where a position was available when the employee returned to work after twelve weeks, the employee was reinstated. For example, Maria Barrero, Else Lipner and Margarita Quintana took medical leaves that exceeded twelve weeks, and they were each reinstated.

(25). In addition, several females took maternity leaves that extended beyond twelve weeks, and each of these women was rehired if a position for which they were qualified remained open at American Express. For instance, Victoria Gonzalez left for maternity leave on May 22, 1991, and returned to American Express on August 26, 1991. This leave of absence was nearly 14 weeks long, but she was reinstated. Similarly, Lissy Martinez began her maternity leave on February 12, 1990, and did not return until July 30, 1990. She was reinstated, however, because there was an open position when she returned from her leave of absence. In contrast, Carmen Marquez–Kahn, Jorge Chavez and Patricia Marti each took medical leave that exceeded twelve weeks, but they were terminated because there were no available positions at the conclusion of their leave of absences.

## CONCLUSIONS OF LAW

(1). Title VII of the Civil Rights Act of 1964 provides that it is an unlawful employment practice for an employer:

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions or privileges of employment, because of such individual's race, color, religion, sex or national origin; or

(2) to limit, segregate, or classify his employees or applicants for employment in any way which deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his station as an employee, because of such individual's race, color, religion, sex or national origin.

42 U.S.C.A. § 2000e–2(a) (West Ann.1991).

(2). In 1978, the United States Congress amended Title VII by the Pregnancy Discrimination Act, which further provides that:

[t]he terms 'because of sex' or 'on the basis of sex' include, but are not limited to, because of or on the basis of pregnancy, childbirth or related medical conditions; and women affected by pregnancy, childbirth or related medical conditions shall be treated the same for all employment-related purposes ... as other persons not so affected but similar in their ability or inability to work.

42 U.S.C.A. § 2000e(k) (West Ann.1991).

■ (3). A plaintiff alleging discrimination on the basis of pregnancy may proceed under either a "disparate impact" or "disparate treatment" theory. *Scherr v. Woodland Sch. Comm. Consol. Dist. No. 50,* 867 F.2d 974, 979 (7th Cir.1988). In this case, Ulloa is proceeding under a disparate treatment theory. Therefore, Ulloa may prove her disparate treatment theory by using either direct or indirect evidence. *Cumpiano v. Banco Santander Puerto Rico,* 902 F.2d 148, 153 (1st Cir.1990). If the plaintiff uses indirect evidence, then the Court must apply the familiar burden-shifting analysis set forth by the United States Supreme Court. *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–04, 93 S.Ct. 1817, 1824–25, 36 L.Ed.2d 668 (1973); *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 252–56, 101 S.Ct. 1089, 1093–95, 67 L.Ed.2d 207 (1981). "A plaintiff may succeed in a Title VII action either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Luna v. City & County of Denver,* 948 F.2d 1144, 1148 (10th Cir.1991).

■ (4). Ulloa is proceeding in this case by using indirect evidence to prove pregnancy discrimination. Under that analysis, if the plaintiff meets her initial burden of establishing a prima facie case of discrimination, then the burden of production shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the challenged employment action. *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 252–53, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981). The burden of persuasion ultimately rests with the plaintiff, however, who must prove that the defendant intentionally discriminated

against her. *Bell v. AT & T,* 946 F.2d 1507, 1509–10 (10th Cir.1991).

■ (5). In *McDonnell Douglas,* the Supreme Court held that a plaintiff establishes a prima facie case of discrimination by demonstrating: (1) membership in a protected class; (2) that she was qualified for the position; (3) that she was not hired; and (4) that, after her rejection, the position remained open and the employer continued to seek applicants with the plaintiff's qualifications. *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. at 1824. It is undisputed that Ulloa was pregnant, was qualified for the position, and was terminated. American Express contends that Ulloa fails to meet the fourth prong of the *McDonnell Douglas* test because she has not demonstrated that her position remained open after her termination. As this Court discussed in the Order Granting in Part and Denying in Part Summary Judgment, filed March 17, 1993, Ulloa satisfied the prima facie case requirement by demonstrating that she was terminated instead of similarly situated employees with less seniority or inferior qualifications. *See Samuelson v. Durkee/French/Airwick,* 760 F.Supp. 729, 735 (N.D.Ind.1991); *Bitsouni v. Sheraton Hartford Corp.,* 33 FEP Cases 895, 897 (D.Conn.1983); *Nellis v. Sunshine Dairy,* 21 FEP Cases 327, 329, 1979 WL 15341 (D.Or.1979).

■ (6). Pursuant to the second step in the *McDonnell Douglas* test, American Express must proffer a legitimate, nondiscriminatory reason for Ulloa's termination. In *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), the Supreme Court held that an employer's burden is satisfied if he "simply describes what he has done" or "produces evidence of legitimate nondiscriminatory reasons." *Id.* at 256, 101 S.Ct. at 1095. American Express produced a legitimate business justification for deciding to lay off an employee by demonstrating a downturn in business during the period when Ulloa was on pregnancy leave of absence. American Express had instituted a "1–800" telephone system and the volume of cardmember mail was reduced, so American Express decided to terminate an employee in the department

that handled correspondence. Economic necessity has been recognized as meeting the employer's burden of production. *Miller v. Fairchild Industries,* 797 F.2d 727, 732 (9th Cir.1986). American Express has also produced a legitimate non-discriminatory business justification for choosing to terminate Ulloa—she had violated the twelve-week reinstatement rule and was therefore not guaranteed a position with American Express upon her return from her leave of absence.

■ (7). Finally, the burden shifts back to Ulloa to prove by a preponderance of the evidence that the legitimate, non-discriminatory reason for termination offered by American Express was not the true reason, but was, in fact, a mere pretext for discrimination. *McDonnell Douglas Corp.,* 411 U.S. at 804, 93 S.Ct. at 1825. Generally, a plaintiff may show pretext indirectly by establishing that the proffered reason is unworthy of credence, or directly by showing that discriminatory reasons more likely motivated the employer's decision. *Burdine,* 450 U.S. at 248, 256, 101 S.Ct. at 1089, 1095. This does not require the plaintiff to prove that discrimination was the only basis for the employer's action, but only that "but for" the unlawful motive defendant would not have fired her. *See McDonald v. Santa Fe Trail Transp. Co.,* 427 U.S. 273, 282 n. 10, 96 S.Ct. 2574, 2580 n. 10, 49 L.Ed.2d 493 (1976).

(8). To satisfy this burden of persuasion, Ulloa presented evidence showing indirectly that she would not have been fired "but for" her pregnancy. Essentially, Ulloa suggests that if she had not become pregnant, then she would not have taken a leave of absence. The Court found that Ulloa would not have been fired if she had not exceeded the twelve-week reinstatement period. Therefore, Ulloa argues that she was terminated because of her pregnancy.

The problem with this circular argument is that it fails to present or rely on any credible evidence that Ulloa was treated differently than any other employee who exceeded the twelve-week reinstatement period. Ulloa has failed to show by a preponderance of the evidence that she received disparate treatment when compared to non-pregnant employees. *See Metz v. Merrill Lynch,* 56 F.E.P. Cases 605, 610, 1991 WL 355199 (D.Ok.1991). American Express produced evidence that all pregnant women on maternity leave and all other persons, whether on medical leave, family leave or personal leave, who returned from a leave of absence within twelve weeks were reinstated. American Express also produced unrefuted evidence that all pregnant women on maternity leave and all persons on non-maternity medical leave who returned from a leave of absence after twelve weeks were not reinstated, unless there was an open position for which they were qualified. Most importantly, American Express demonstrated at least two instances where females on maternity leave *were* reinstated, even though they returned to their positions after the expiration of the twelve week reinstatement deadline, because there was an open position. There is simply no evidence that American Express treated pregnant women any differently than other employees who violated reinstatement policy. "Plaintiff would have been treated no differently if she had suffered another disability, unrelated to childbirth or pregnancy." *Page v. Chandonnet,* 51 F.E.P. Cases 764, 767, 1989 WL 206563 (D.Md.1989).

### *CONCLUSION*

American Express may not have treated Nancy Ulloa with the kindness and fairness that should be the standard for employer-employee relationships within large multinational corporations. It is difficult for the Court to understand why American Express would choose to rely on a reinstatement policy violation, rather than productivity or seniority when deciding which employee should be terminated at a time of workforce reduction. Nevertheless, Title VII does not require corporations to treat their employees with fairness or kindness. It only requires that American Express not discriminate against pregnant women. In this instance, American Express followed its guidelines and treated Ulloa in the same manner it would have treated any other employee who took a leave of absence, but failed to return within the twelve-week reinstatement period.

Consequently, for the preceding reasons, it is hereby

ORDERED AND ADJUDGED that judgment shall be entered in favor of Defendant

**1572**

American Express Travel Related Services, Inc. and against Plaintiff Nancy Ulloa by separate order of this Court, pursuant to *Fed.R.Civ.P.* 58.

DONE AND ORDERED.