

1997 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

10-21-1997

# Carnegie Center Assoc. v. Rhett

Precedential or Non-Precedential:

Docket
96-5566

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1997

Recommended Citation

"Carnegie Center Assoc. v. Rhett" (1997). *1997 Decisions.* Paper 246.
http://digitalcommons.law.villanova.edu/thirdcircuit_1997/246

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1997 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed October 31, 1997

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 96-5566

IN RE:

CARNEGIE CENTER ASSOCIATES,

      Debtor

DEBORAH RHETT,

      Appellant

v.

CARNEGIE CENTER ASSOCIATES

On Appeal from the United States District Court
for the District of New Jersey
(D.C. Civ. No. 96-00852)

Argued June 23, 1997

BEFORE: GREENBERG, MCKEE, and WELLFORD,*
Circuit Judges

(Filed: October 31, 1997)

_____
*Honorable Harry W. Wellford, Senior Judge of the United States Court
of Appeals for the Sixth Circuit, sitting by designation.

      Elaine R. Jones
      Director-Counsel
      Charles Stephen Ralston
      Norman J. Chachkin
      Catherine B. Powell (argued)
      NAACP Legal Defense &
      Educational Fund
      99 Hudson Street
      16th Floor
      New York, NY 10013

      Lanier E. Williams
      Christopher Morkides
      P.O. Box 6584

Philadelphia, PA 19138

   Attorneys for Appellant

James E. Stahl (argued)
Remy M. Quinones
Borrus, Goldin, Foley, Vignuolo,
Hyman & Stahl
2875 United States Highway 1
P.O. Box 7463
North Brunswick, NJ 08902

   Attorneys for Appellee

OPINION OF THE COURT

GREENBERG, Circuit Judge.

This case comes on before this court on appeal from the district court's order affirming a bankruptcy court order expunging the claim of the appellant Deborah Rhett, a black female, which arose out of the termination of her employment when her employer, appellee Carnegie Center Associates (Carnegie), abolished her position. The bankruptcy court had subject matter jurisdiction under 28 U.S.C. S 157(b)(2)(B), (O) and 28 U.S.C. S 1334(b). The district court had appellate jurisdiction over the bankruptcy court's order pursuant to 28 U.S.C. S 158. We have jurisdiction under 28 U.S.C. S 1291, 28 U.S.C.S 158(d), and 42 U.S.C. S 2000e-5(j).

A. FACTUAL AND PROCEDURAL HISTORY

The facts in the case were developed at the trial of the adversary proceeding in the bankruptcy court. Rhett began working for Carnegie, a real estate company Allan Landis owned and controlled, as a temporary secretary in April 1989. She became a full-time permanent secretary in Carnegie's Accounting/Finance Department on July 17, 1989, and received a salary increase of $1,500 in January 1990 based on her satisfactory performance.

In June 1990, Rhett informed her supervisors and co-workers that she was pregnant. When she told Keith Gormisky, the controller, and Gary Turndorf, the chief financial officer and counsel, of her pregnancy both asked if she was going to get married. Turndorf commented that being a single parent was difficult, and Rhett claimed that Gormisky said that getting married was: "in society's eyes . . . the right thing to do." Nevertheless, Turndorf testified

that the fact that Rhett was unmarried played no role in Carnegie's later decision to abolish her position. Rhett also claimed that Gormisky became irate with her just before she left on maternity leave and stated that she was on "thin ice." The bankruptcy court, apparently attributing this comment to Turndorf, found it related to his view of the quality of Rhett's work.

Rhett circulated a memo to the managerial officers (including Landis, Turndorf and Gormisky) on December 18, 1990, stating that she planned to be on maternity leave from December 21, 1990, until about April 15, 1991. Carnegie hired a temporary secretary to fill in while she was gone. Carnegie did not have a formal maternity leave policy, but Turndorf testified that its practice was to"try and hold it open for them if we could" so that "[w]hen they wanted to come back, if they contacted us and there was something open that was suitable, we would offer it to them." See bankruptcy court opinion at 5-6 (discussing two employees who left on maternity leave and subsequently returned to the same or similar positions).

Carnegie had experienced financial difficulties prior to Rhett's departure that worsened while she was gone, forcing it to make staff cutbacks to decrease costs.

3

Consequently, just before Rhett originally had planned to return, Carnegie eliminated several positions, including Rhett's secretarial position, and terminated several employees, including her supervisor, Geoff Hammond. On March 26, 1991, Gormisky wrote Rhett to tell her that her position had been eliminated.1 Turndorf testified that Carnegie did not make a performance-based evaluation as to which secretary's employment it should terminate because it did not consider Rhett an employee at that time and it was easy to abolish her former position by not hiring any more temps, thus reducing the number of secretaries from four to three. At that time Rhett was still away from work because she was under medical care (counseling) for post-partum depression, which she continued until June of 1991. When Rhett called Gormisky after receiving the letter, he reiterated that her position had been abolished. She asked about two other positions with Carnegie and was told they were not available to her. In fact, Carnegie did not interview Rhett, or consider hiring her, for any other position.

Rhett filed a suit in the district court under Title VII and the New Jersey Law Against Discrimination against Carnegie on November 26, 1993, alleging discrimination on

the basis of her race, gender, and marital status. 2 The district court action was automatically stayed because Carnegie was undergoing bankruptcy reorganization. Thus, Rhett pursued the matter by filing a proof of claim with the bankruptcy court on February 19, 1994. Thereafter the district court terminated the district court action without prejudice and the case continued as an adversary proceeding in the bankruptcy court. The bankruptcy court found in Carnegie's favor after a three-day bench trial. It held that Carnegie had to reduce costs because offinancial

_____

1. March 26, 1991, is the date Carnegie listed with the EEOC as Rhett's "Date of Termination." In addition, Rhett's medical coverage continued with Carnegie until this date, as two weeks later she received COBRA information. The bankruptcy and district courts, however, found that Carnegie did not consider Rhett an employee at the time it abolished her position.

2. She also made a claim under 42 U.S.C. S 1981 but she has not advanced that claim in these proceedings so we do not discuss it.

4

difficulties and that it eliminated staff at both the management and support levels. The court held that Carnegie abolished Rhett's position for the legitimate non-discriminatory reason that she was away from work, and not because of discrimination on the basis of race, gender or pregnancy. The court further held that she was not qualified for any of the other positions for which she asserted Carnegie should have interviewed her. The district court affirmed in an opinion and order entered August 6, 1996, holding that the bankruptcy court's factual findings were not clearly erroneous and these findings "compelled the conclusion that the secretarial position held by appellant was abolished for legitimate, non-discriminatory reasons." Rhett then appealed to this court.

The main issue on this appeal is whether an employee's absence on maternity leave can be a legitimate non-discriminatory reason for her termination. Inasmuch as the district court sat as an appellate court, we exercise plenary review of its decision. Universal Minerals, Inc. V. C. A. Hughes & Co., 669 F.2d 98, 101-102 (3d Cir. 1981). Findings of fact by the bankruptcy judge, however, are only reversible if clearly erroneous. Bankruptcy Rule 8013.

B. PREGNANCY, RACIAL AND GENDER DISCRIMINATION

On this appeal Rhett claims that Carnegie terminated her

employment because of her pregnancy and on account of her race and gender in violation of Title VII and the New Jersey Law Against Discrimination. We confine our discussion to Title VII because her state law claims are analyzed in the same way as her Title VII claims. See Marzano v. Computer Science Corp., 91 F.3d 495, 502 (3d Cir. 1996). Indeed, Rhett apparently recognizes this point because she does not cite a single New Jersey state court opinion in either of her briefs on this appeal.

Title VII prohibits employment discrimination based on an individual employee's sex. 42 U.S.C. S 2000e-2(a). The Pregnancy Discrimination Act ("PDA"), a 1978 amendment to Title VII, states:

> The terms `because of sex' or `on the basis of sex' include, but are not limited to, because of or on the basis of pregnancy, childbirth, or related medical conditions; and women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes . . . as other persons not so affected but similar in their ability or inability to work. . . .

42 U.S.C. S 2000e(k). There is employment discrimination whenever an employee's pregnancy is a motivating factor for the employer's adverse employment decision. 42 U.S.C. S 2000e-2(m).

The bankruptcy and district courts analyzed Rhett's claim as being based on circumstantial evidence implicating the burden shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817 (1973). In a Title VII case such as this one involving a reduction in force, in order to make out a prima facie case the plaintiff must show that (1) she belonged to a protected class, (2) she was qualified for the position from which she was terminated, (3) she was terminated and (4) persons outside of the protected class were retained. See Armbruster v. Unisys Corp., 32 F.3d 768, 777 (3d Cir. 1994). While neither court made specific reference to the applicability of the modified McDonnell Douglas framework in reduction in force situations, the record clearly establishes that Carnegie did reduce its force, so we will apply the appropriate framework. Once the plaintiff establishes a prima facie case, the burden shifts to the defendant to articulate a legitimate non-discriminatory reason for the plaintiff 's termination. Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 252-53, 101 S.Ct. 1089, 1093 (1981). If the defendant articulates such a reason, the plaintiff then must

prove that the facially legitimate reason was a pretext for a discriminatory motive. Id.3

_____

3. Rhett argues that this case involves a per se violation of the PDA, so that she has presented direct evidence of discrimination. Accordingly, in her view we should analyze the case under Trans World Airlines, Inc. v. Thurston, 469 U.S. 111, 105 S.Ct. 613 (1985), rather than under McDonnell Douglas. We reject this argument because, as we discuss below, consideration of an employee's absence on maternity leave is not a per se violation of the PDA. Furthermore, the bankruptcy and district courts did consider Rhett's claim of direct evidence of discrimination and properly rejected it. Thus, this is a McDonnell Douglas case.

The bankruptcy and district courts held that Rhett did not establish a prima facie case. We disagree with this conclusion but are satisfied that the courts' error is harmless because the bankruptcy court considered the issues relevant to a reduction in force analysis at a trial and made the requisite findings for such an analysis. Thus, insofar as this case involves a reduction in force, we focus on Carnegie's reason for terminating Rhett's employment.

This case largely boils down to a dispute over one issue: whether terminating an employee because she is absent on maternity leave is a violation of the PDA. The bankruptcy and district courts found that Carnegie eliminated Rhett's position because she was not at her place of employment at that time, not because of her pregnancy. Carnegie argues, and the bankruptcy and district courts found at least implicitly, that Rhett was not employed by Carnegie at the time Carnegie eliminated her position. Rhett asserts that she was an employee on unpaid leave at that time. Carnegie had no formal maternity leave policy, but it did have a practice of allowing employees to return from leave to the same or similar position if one was available. It is undisputed that Carnegie maintained Rhett's medical insurance until it eliminated her position on March 26, 1991. Therefore, it appears that Rhett was an employee of Carnegie on an unpaid leave of absence who sought reinstatement. We need not, however, definitely so determine because even assuming that Carnegie still employed Rhett when it abolished her position, under the Armbruster reduction in force framework, she is not entitled to relief.

Regulations promulgated under Title VII provide:

> Disabilities caused or contributed to by pregnancy, childbirth, or related medical conditions, for all job-

related purposes, shall be treated the same as disabilities caused or contributed to by other medical conditions. . . . Written or unwritten employment policies and practices involving matters such as the commencement and duration of leave . . . [and] reinstatement . . . shall be applied to disability due to pregnancy . . . on the same terms and conditions as they are applied to other disabilities.

7

29 C.F.R. S 1604.10(b). The interpretive question and answer section accompanying the regulation specifies that an employer must hold open the job of a woman absent because of pregnancy "on the same basis as jobs are held open for employees on sick or disability leave for other reasons." 29 C.F.R. Pt. 1604 App. Question 9. On the other hand, the PDA does not require that employers treat pregnant employees better than other temporarily disabled employees. Troupe v. May Dep't Stores Co., 20 F.3d 734, 738 (7th Cir. 1994); Maganuco v. Leyden Community High Sch. Dist. 212, 939 F.2d 440, 444 (7th Cir. 1991); H. Rep. No. 95-948 at 4-5 (1978), reprinted, 1978 U.S.C.C.A.N. 4749, 4752-53 (basic principles of the PDA); see also California Fed. Sav. and Loan Ass'n v. Guerra, 479 U.S. 272, 289 & n.29, 107 S.Ct. 683, 694 & n.29 (1987) (holding that the PDA neither requires nor prohibits states from mandating maternity leave and reinstatement policies).

Rhett argues that Carnegie terminated her employment solely because of her absence and her absence was due solely to her pregnancy and related medical conditions. Consequently, in her view Carnegie terminated her employment because of her pregnancy. The Supreme Court has held that under the Age Discrimination in Employment Act an employer must ignore an employee's age in certain employment decisions, but not any other characteristics such as pension expense. Hazen Paper Co. v. Biggins, 507 U.S. 604, 612, 113 S.Ct. 1701, 1707 (1993). The Court of Appeals for the Seventh Circuit has held, by analogy to Hazen, that the PDA "requires the employer to ignore an employee's pregnancy, but ... not her absence from work, unless the employer overlooks the comparable absences of non-pregnant employees. . . ." Troupe, 20 F.3d at 738. This holding is entirely consistent with the plain language of the PDA and the regulations we discuss above. This view eliminates Rhett's theory of transitivity, that if A (termination) is caused by B (absence) which is caused by C (pregnancy), then C causes A. Other courts similarly have held that "the PDA does not force employers to pretend that absent employees are present whenever their absences are caused by pregnancy." Crnokrak v. Evangelical Health Sys.

Corp., 819 F. Supp. 737, 743 (N.D. Ill. 1993).

We recognize that Smith v. F.W. Morse & Co., 76 F.3d 413 (1st Cir. 1996), includes language contrary to that of Troupe for in Smith the court said that "an employer must put an employee's pregnancy (including her departure on maternity leave) to one side in making its employment decisions." Id. at 424 (emphasis added). In Smith, the pregnant employee was assured before she went on maternity leave that her position was secure, but the employer then eliminated her position during a reorganization while she was away. Id. at 418-19. The court's holding, however, was that the elimination of the position was not an act of pregnancy discrimination merely because the employer discovered that the position was superfluous while the employee was on maternity leave; thus there was no causal nexus between her termination and her pregnancy. Id. at 424-25.

Notwithstanding the passage in Smith which we have quoted, Carnegie argues that Smith applies here because in its view Smith demonstrates that its action in terminating Rhett's employment was justified as it, like the employer in Smith, had a legitimate non-pregnancy based reason to discharge the pregnant employee. Smith may be distinguished, however, because Carnegie eliminated Rhett's position, rather than that of one of the other secretaries, because she was away on maternity leave. While it was apparent that one of the secretary positions was not needed, it was only Rhett's absence which led to her termination. Carnegie has made no showing that Rhett's position would have been eliminated if she had not been away at the time. Indeed, Carnegie made no comparative evaluation of the secretaries' performance. In Smith, the particular position of the pregnant employee was shown to be superfluous while she was away. Smith, unlike this case, did not involve a choice by the employer as to which of several similar positions to eliminate.

This case is unusual in that Carnegie terminated an employee who had performed satisfactorily solely because of an economically justified reduction in force while she was away on maternity leave. See Geier v. Medtronic, Inc., 99 F.3d 238, 243 (7th Cir. 1996) (fired pregnant employee not qualified because she could not meet required performance quotas); Troupe, 20 F.3d at 735 (pregnant employee fired

for chronic tardiness prior to maternity leave); Soreo-Yasher v. First Office Management, 926 F. Supp. 646, 649 (N.D. Ohio 1996) (employee replaced while on maternity leave because of business need and company had written policy of not guaranteeing reinstatement after any leave of absence); Morrissey v. Symbol Techs., Inc., 910 F. Supp. 117, 121 (E.D.N.Y. 1996) (fired employee's maternity leave extended beyond time for which employer's policy guaranteed reinstatement); Rudolph v. Hechinger Co., 884 F. Supp. 184, 186, 188 (D. Md. 1995) (employee terminated while on maternity leave because of reasons independent of her absence); Ulloa v. American Express Travel Related Servs. Co., 822 F. Supp. 1566, 1570-71 (S.D. Fla. 1993) (employee terminated in reduction in force while on maternity leave because her leave extended beyond time for which reinstatement guaranteed); Crnokrak, 819 F. Supp. at 743 (employer justification for demoting employee while on maternity leave could be pretext); Felts v. Radio Distrib. Co., 637 F. Supp. 229, 233 (N.D. Ill. 1985) (employer justification of termination because of financial difficulties was a pretext). Furthermore, in this case Carnegie had need after Rhett was gone for an employee to do the type of work she did before it eliminated her position.

Nevertheless, the law covering this case is clear for the view of the Court of Appeals of the Seventh Circuit which it set forth in Troupe, that an employer legitimately can consider an employee's absence on maternity leave in making an adverse employment decision, is consistent with and, indeed, is compelled by the plain language of the PDA. Thus, Troupe properly requires the plaintiff employee seeking to recover under the PDA to show that the employer treated her differently than non-pregnant employees on disability leave. See 29 C.F.R.S 1604.10. While we do not ignore the contrary suggestion in Smith, we do not find it controlling because it is inconsistent with the language of the PDA. Thus, we cannot find, as Rhett urges, that the mere consideration of an employee's absence on maternity leave is a per se violation of the PDA. In short, the PDA does not require an employer to reinstate an employee merely because she has been absent on maternity leave. Rather, the PDA is a shield against discrimination, not a sword in the hands of a pregnant employee.

10

Rhett has not made a showing that Carnegie treated her differently than it would have treated a non-pregnant employee absent on disability leave. Of course, it was difficult for her to make such a showing because Carnegie never has had an employee on disability leave for a protracted period for a reason other than pregnancy. Thus,

we must affirm the district court's denial of her PDA claim for the reasons indicated. See Ulloa v. American Express Travel Related Servs. Co., 822 F. Supp. at 1571 (Employer is entitled to judgment when employee "has failed to show by a preponderance of the evidence that she received disparate treatment when compared to non-pregnant employees.").

The PDA does not require an employer to grant maternity leave or to reinstate an employee after a maternity leave. The PDA merely requires that an employer treat a pregnant woman in the same fashion as any other temporarily disabled employee. In this regard, we point out that it is not unlawful under the Americans with Disabilities Act for an employer when reducing its force to discharge an employee away from work by reason of a temporary disability. See Sanders v. Arneson Prods., Inc., 91 F.3d 1351, 1354 (9th Cir. 1996); Rogers v. International Marine Terminals, Inc., 87 F.3d 755, 759 (5th Cir. 1996). We acknowledge that arguably it was unfair for Carnegie to fire Rhett because she was on leave rather than to decide which secretary's position to abolish on the basis of seniority or merit, but it was not illegal for it to do so unless it would not have eliminated the position of another employee on disability leave who was not pregnant. The PDA does not require fairness. See Ulloa v. American Express Travel Related Servs. Co., 822 F. Supp. at 1571.

Judge McKee in his dissent seems to believe that we are equating "pregnancy with a temporary disability under the ADA." Dissent at 25. Of course, we are doing no such thing. Rather, we are holding that it is not unlawful under the PDA to terminate an employee absent by reason of pregnancy if the employer would have terminated an employee absent by reason of a different temporary disability. Thus, notwithstanding the intricate reasoning of the dissent, this case at bottom is quite straightforward and uncomplicated.

11

In view of our analysis, we conclude that although the bankruptcy and district courts erred in finding that Rhett did not make out a prima facie case of pregnancy discrimination (because they did not apply the Armbruster reduction in force analytical framework), the error was harmless. Carnegie asserted a legitimate non-discriminatory reason for Rhett's termination, that she was away on leave. Rhett has not satisfied her burden of showing that this reason was pretextual. Therefore, we will affirm insofar as this case involves the termination of Rhett's position. Of course, our analysis requires that we

affirm the district court in its rejection of her race and gender claims as well, based on the elimination of her position.4

In reaching our result, we have not overlooked Rhett's argument that this case is somehow different than a case based on a claim of discrimination predicated either on race or gender, because she bases her claim on both race and gender. This argument adds nothing to her case because regardless of the basis for her claim of discrimination, she cannot establish that the legitimate reason that Carnegie proffered for terminating her was pretextual. Furthermore, we have not ignored Rhett's argument that Carnegie's termination of her position had a discriminatory impact of her based on her race. Rather, we reject this contention as entirely insubstantial for an employee is not insulated from having her position lawfully terminated merely because she happens to be a minority.

_____

4. We are aware that Rhett alleged certain comments by her superiors which could lead to an inference of discrimination against her, but in holding that there is no evidence of racial or gender discrimination, the bankruptcy court implicitly found that Rhett's testimony that Turndorf and Gormisky were abusive toward her regarding her status as an unwed mother was not credible, or that the explanation and denials by Turndorf and Gormisky were more credible. We cannot hold this factual finding clearly erroneous. Thus, there was no error in not inferring discrimination on the basis of these remarks. In any event, Carnegie articulated a legitimate non-discriminatory reason for terminating Rhett and the bankruptcy court, in an unassailable finding, accepted that reason.

12

Rhett also argues that Carnegie should have considered her for alternate positions. She says that the positions of property management administrative assistant, secretary to Landis and receptionist became open while she was on maternity leave and she was qualified for all of them. It is not disputed that she was not considered for any of these positions. But the bankruptcy court found as a fact, and the district court affirmed, that Rhett was not qualified for the property management position or the position of assistant or secretary to Landis. The bankruptcy court also found that Rhett never indicated that she would take a lower paying or temporary job. Rhett argues that these factual findings are clearly erroneous.

Rhett has offered no more than her own opinion that she was qualified for the property manager position. Gormisky testified that the position required more than basic

secretarial skills and he did not believe that Rhett adequately could perform in the job. Turndorf also testified that he would not have hired her for that position because he did not feel she would perform well. This is more than enough support for the bankruptcy court's finding that Rhett was not qualified. Similarly, Rhett asserts that she was qualified to be Landis's personal secretary because of her extensive secretarial experience. The bankruptcy court's finding that Rhett was not qualified for this job is supported by Turndorf's testimony that the job required a special attitude and ability to anticipate Landis's needs which Rhett did not have. Inasmuch as the bankruptcy court was not clearly erroneous in finding Rhett not qualified for these positions, she has not made out a prima facie case of discrimination because of Carnegie's failure to hire or interview her.

On the other hand, it is clear that Rhett was qualified for the position of receptionist. But the bankruptcy court held that she never expressed an interest in this job, which paid less than her prior position. Since this is a failure to hire situation, rather than a discharge situation, under McDonnell Douglas Rhett must show that she applied for the position. It is undisputed that Rhett did not apply for this position, or even express any interest in it.

13

Rhett argues that Carnegie had an affirmative duty to contact her (but cites no case for this proposition), and she would have expressed an interest if she had been contacted. The receptionist position was the lowest paying job in the office. It was not unreasonable for Carnegie to assume that Rhett would not accept this position, especially when she did not express any interest in it. On this point we observe that the bankruptcy court found that Rhett obtained a position with the Robert Wood Johnson Foundation and started work there on January 29, 1992, and earned $22,500 in 1992. Thus, it is understandable why Rhett did not seek a position as a receptionist as she was capable of obtaining more financially rewarding employment. Further, Turndorf testified that it was customary for employees returning from maternity leave to contact Carnegie, rather than Carnegie contacting them when a position opened up. Given this custom, we cannot find any error in the lower courts' conclusion that Rhett failed to state a prima facie case of discrimination because she was not given any of these positions.

C. CONCLUSION

We hold, in agreement with the Court of Appeals for the

Seventh Circuit, the plain language of the PDA, and the regulations under the PDA, that an employee alleging a PDA violation must show that her employer treated her differently than it would have treated an employee on leave for a temporary disability other than pregnancy. It is not a violation of the PDA for an employer to consider an employee's absence on maternity leave in making an adverse employment decision if it also would have considered the absence of an employee on a different type of disability leave in the same way. Inasmuch as Carnegie asserted that Rhett's absence from work, rather than her pregnancy, was the reason for her termination, and Rhett has failed to show that this assertion was pretextual, her claim fails.5

_____

5. We note, however, that there are federal and state laws which do require parental leave and reinstatement. See  29 U.S.C. SS 2612, 2614; N.J. Stat. Ann. S 34:11B-4, -7 (West Supp. 1997). These laws are not applicable in this case because Carnegie has fewer that 50 employees. 29 U.S.C. S 2611(4)(a); N.J. Stat. Ann. S 34:11B-3f.

14

In view of our conclusions, we will affirm the judgment of the district court entered August 6, 1996.

15

McKEE, Circuit Judge, dissenting.

I agree that Deborah Rhett's claim of racial discrimination was properly dismissed. However, I respectfully dissent because I believe that the district court erred in affirming the bankruptcy court's dismissal of Rhett's claim of sex discrimination. The bankruptcy court concluded that "the uncontradicted testimony of the debtor establishes that the debtor had to let someone in the secretarial group go and the fact that Rhett was not working for the company at the time made it logical that she be the one." Bankr Ct. Op. at 15 (1996). I believe that the issue is not whether the employer had a logical reason for choosing Rhett (It clearly did.), but whether doing so when her absence was due solely to her pregnancy was illegal sex discrimination under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. S 2000e-2(a). I fear that the majority's failure to hold that it did constitute sex discrimination will eviscerate the protections Congress intended when it enacted the Pregnancy Discrimination Act of 1978 ("PDA"), 42 U.S.C. S2000e(k), as an amendment to

Title VII.

I. BACKGROUND OF THE PREGNANCY
DISCRIMINATION ACT

Title VII makes it an unlawful employment practice for an
employer

> to discriminate against any individual with respect to
> his compensation, terms, conditions, or privileges of
> employment, because of such individual's . . . sex

S 2000e-2(a)(1). Congress created the Equal Employment
Opportunity Commission ("EEOC") to implement Title VII
and the EEOC developed guidelines through which
employers and employees could better understand the
protections afforded under Title VII. Those guidelines
"implemented the Title VII prohibition of sex
discrimination", H.R. Rep. No. 95-948, at 2 (1978),
reprinted in 1978 U.S.C.C.A.N. 4749, 4752, and they
expressly extend the protection of Title VII to conditions
caused by pregnancy.

> Disabilities caused or contributed to by pregnancy,
> childbirth, or related medical conditions, for all job-
> related purposes, shall be treated the same as
> disabilities caused or contributed to by other medical
> conditions . . . . Written or unwritten employment
> policies and practices involving matters such as the
> commencement and duration of leave, the availability
> of extensions, the accrual of seniority and other
> benefits and privileges, reinstatement, and payment
> under any health or disability insurance or sick leave
> plan, formal or informal, shall be applied to disability
> due to pregnancy, childbirth or related medical
> conditions on the same terms and conditions as they
> are applied to other disabilities . . . .

29 C.F.R. S 1604.10(b). The guidelines also contain an
interpretive question and answer section in which the
following exchange is made:

> Q: Must an employer hold open the job of an
> employee who is absent on leave because she is
> temporarily disabled by pregnancy-related conditions?

> A: Unless the employee on leave has informed the
> employer that she does not intend to return to work,
> her job must be held open for her return on the same
> basis as jobs are held open for employees on sick or

disability leave for other reasons.

29 C.F.R. pt. 1604, app. Question 9. The majority concludes that this means that Carnegie Center Associates ("Carnegie") can terminate Rhett for her absence, even though it is caused by pregnancy, so long as Carnegie would have terminated an absent employee who was not pregnant. See Maj. Op. at 7-8.

However, the circumstances leading to Title VII's current proscriptions against sex discrimination undermine the majority's analysis. Title VII, as originally enacted, did not explicitly define sex discrimination to include disparate treatment based upon, or related to, pregnancy. As a result, some courts adopted a narrow view of the extent to which Title VII's proscription against sexual discrimination included disparate treatment based upon pregnancy and related conditions. In General Electric v. Gilbert, 429 U.S.

125, 97 S.Ct. 401, 50 L.Ed.2d 343 (1976), the Supreme Court held that an insurance plan that excluded coverage for pregnancy-related disabilities did not constitute illegal gender-based discrimination. There, an employer's disability plan provided coverage for nonoccupational sickness and accidents, but excluded coverage for pregnancy and pregnancy-related disabilities. The plan did, though, include coverage for nonoccupational disabilities and medical procedures common to men, e.g. prostatectomies, vasectomies and circumcisions. Gilbert, 429 U.S. at 145-46. A group of employees sued under Title VII, alleging that the insurance plan was illegal sexual discrimination because it excluded a class of disabilities unique to women. The district court held that the plan did constitute illegal sex discrimination in violation of Title VII and the Court of Appeals for the Fourth Circuit affirmed. However, prior to the decision of the court of appeals, but subsequent to the decision of the district court, the Supreme Court decided Geduldig v. Aiello, 417 U.S. 484, 94 S.Ct. 2485, 41 L.Ed.2d 256 (1974).

In Geduldig, the Supreme Court upheld the validity of a nearly identical insurance policy against an attack under the Equal Protection Clause of the Fourteenth Amendment. The Court in Geduldig reasoned that the challenged policy was simply a business decision as to which risks an employer would insure. "The program divides potential recipients into two groups pregnant women and nonpregnant persons. While the first group is exclusively female, the second includes members of both sexes." Geduldig, 417 U.S. at 496-97 n. 20. The Court in Gilbert

upheld the challenged disability plan based upon its earlier holding in Geduldig. The Court reasoned that, even though Geduldig was based upon an equal protection argument, and Gilbert was brought under Title VII, the logic of Geduldig still applied. Accordingly, the Court held that since there was no risk from which women were protected and men were not and no risk from which men were protected that women were not, the exclusion of pregnancy-related disabilities did not invalidate the Gilbert policy under Title VII. The majority minimized the relevance of the EEOC guidelines when considering what Congress intended under Title VII.

18

Justice Brennan dissented, arguing that the Court's analysis was "simplistic and misleading" because the plan included procedures that were specific to men while excluding pregnancy-related procedures that were unique to women. 429 U.S. at 252 (Brennan, J., dissenting). He noted that "pregnancy affords the only disability, sex-specific, or otherwise, that is excluded from coverage." Id. Accordingly, he did not think that the classification could be saved from a finding of illegal discrimination under Title VII merely because it was a "facially neutral classification." Id. at 154. He concluded that the Court erred in accepting the employer's explanation that the plan merely excluded certain risks from coverage in a nondiscriminatory way. "[T]he demonstration of purposeful discrimination is not the only ground for recovery under Title VII. . . .[A] prima facie violation of Title VII . . . also is established by demonstrating that a facially neutral classification has the effect of discriminating against members of a defined class." Id. at 153-54.

According to Justice Brennan, "the determinative question must be whether the social policies and aims to be furthered by Title VII and filtered through the phrase `to discriminate' contained in S 703(a)(1) fairly forbid an ultimate pattern of coverage that insures all risks except a commonplace one that is applicable to women but not to men." Id. at 154. He noted that the Court had previously recognized that "discrimination is a social phenomenon encased in a social context and therefore, unavoidably takes its meaning from the desired end products of the relevant legislative enactment, end products that may demand due consideration to the uniqueness of `disadvantaged' individuals." Id. at 159. (discussing Lau v. Nichols, 414 U.S. 563, 94 S.Ct. 786, 39 L.Ed.2d 1 (1974)) (emphasis added). Justice Brennan concluded that the EEOC guidelines were "reasonable responses to the uniform testimony of governmental investigations which show that pregnancy

exclusions built into disability programs both financially burden women workers and act to break down the continuity of the employment relationship, thereby exacerbating women's comparatively transient role in the labor force." Id. at 158. Justice Brennan believed that the EEOC guidelines, "[i]n dictating pregnancy coverage under

Title VII," had "merely settled upon a solution now accepted by every other Western industrial country." Id. (citing Dept. of Health, Education, and Welfare, Social Security Programs Throughout the World, (Research Project No. 40) pp. ix, xviii, xix (1971).1 Congress reacted to Gilbert by enacting the Pregnancy Discrimination Act. See Newport News Shipbuilding and Dry Dock Co. v. EEOC, 462 U.S. 669, 678, 103 S.Ct. 2622, 2628, 77 L.Ed.2d 89 (1983). That act amended the "Definitions" section of Title VII in part as follows:

> The terms `because of sex' or `on the basis of sex' include, but are not limited to, because of or on the basis of pregnancy, childbirth, or related medical conditions; and women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes . . . as other persons not so affected but similar in their ability or inability to work . . . .

42 U.S.C. S 2000e(k).

> When Congress amended Title VII in 1978, it unambiguously expressed its disapproval of both the holding and the reasoning of the Court in the Gilbert decision . . . . The House Report stated, `It is the Committee's view that the dissenting Justices correctly interpreted the Act.' Similarly, the Senate Report quoted passages from the two dissenting opinions, stating that they `correctly express both the principle and the meaning of Title VII.'

Newport News, 462 U.S. at 678. (citing H.R. Rep. No. 95-948 and S. Rep. No. 95-331, at 2-3 (1977)).

II. INTERPLAY OF THE PDA AND THE AMERICANS WITH DISABILITIES ACT ("ADA")

The majority sums up its position as follows: "[t]he PDA merely requires that an employer treat a pregnant woman
_____

1. Justice Stevens also dissented, but his analysis was based upon the

policies in question treating the risk of absenteeism caused by pregnancy differently than any other kind of absence. Id. at 161.

20

the same as any other temporarily disabled employee. In this regard we point out that it is not unlawful under the Americans with Disabilities Act for an employer when reducing its force to discharge an employee away from work by reason of a temporary disability." Maj. Op. at 11. Thus, the majority equates pregnancy-related disability with temporary disabilities under the ADA, and that analogy drives the majority's analysis.

I do not think that Rhett's claim can be decided by simply stating that the PDA requires her to be treated the same as any other employee and reasoning that her position can be terminated because an absent nonpregnant employee could have his or her position terminated under the facts of this case. Although the case law and EEOC guidelines refer to Title VII's requirement that pregnant employees be treated the same as other employees, those cases usually involve determining whether employee benefits or insurance policies discriminate by excluding pregnant employees or affording them less protection than afforded nonpregnant employees. That was the issue in Gilbert and Newport News. For example, in Gilbert, Justice Brennan stated in his dissent: "A realistic understanding of conditions found in today's labor environment warrants taking pregnancy into account in fashioning disability policies . . . . Contemporary disability programs are not creatures of a social or cultural vacuum devoid of stereotypes and signals concerning the pregnant woman employee." 429 U.S. at 160. The Court struck down the challenged health insurance policies in Newport News because they were the "mirror image of the plan at issue in Gilbert." Newport News, 462 U.S. at 685. See also Arizona Governing Committee for Tax Deferred Annuity and Deferred Compensation Plans v. Norris, 463 U.S. 1073, 1074, 103 S.Ct. 3492, 3494, 77 L.Ed.2d 1236 (1983) (An employer who offers "its employees the option of receiving retirement benefits from one of several companies selected by the employer, all of which pay a woman lower monthly retirement benefits than a man who has made the same contributions," violates Title VII.).

Thus, in the health insurance and employee benefits context it is now clear that pregnancy-related conditions

21

must be treated the same as conditions that are not pregnancy-related. However, a simple example demonstrates the danger of carrying that basic premise too far beyond the insurance or benefits context.

Historically, employers have been reluctant to hire women or have afforded women different conditions of employment because of a generalized belief that a female employee would likely leave her job to raise a family. Accordingly, there was a reluctance to devote resources to train or to teach them a job related skill.

I doubt that an employer is precluded from refusing to hire a male employee because of a reasonable belief that the potential employee will leave shortly after he is hired. However, I think few would argue that the same employer could refuse to hire a female job applicant out of a concern that she would soon become pregnant and leave her job to raise a family. Similarly, absent a contract provision to the contrary, an employer could terminate a male employee who missed two weeks of work during his first year on the job in violation of a policy prohibiting more than one week of sick leave during the employee's first year on the job.[2] However, I think it clear that the PDA would prohibit that same employer from terminating a female employee who missed the same two weeks because of pregnancy or a pregnancy-related condition. Those two employees can not be treated the same because Congress has already differentiated their situations by enacting the PDA. One can not avoid a claim of discrimination by treating persons who are not similarly situated the same. Yet, this is what the majority's analysis does. The majority's reasoning would allow an employer to terminate a female employee because she missed a crucial meeting with an important client if a male employee would be terminated, even if the female missed the meeting because she was in labor delivering a baby, or suffering from a pregnancy-related condition. Although it may not be fair to terminate the male, it would

_____

2. As I discuss below, if the employee's condition was "temporary" he would not be covered by the Americans with Disabilities Act and could be terminated absent a contract that prevented such an action on the part of the employer.

not be illegal. It is illegal to terminate the female because of the PDA. Cf. California Savings and Loan v. Guerra, 479 U.S. 272, 292 n.42, 107 S.Ct. 683, 695, 93 L.Ed.2d 613 (1987) ("[W]e conclude that in enacting the PDA Congress

did not intend to prohibit all favorable treatment of pregnancy . . . .").

The majority notes that pregnancy is a temporary condition that gives rise to a temporary disability. It argues that since the PDA bars discrimination based upon pregnancy, it merely requires that pregnant employees be treated the same as all other temporarily disabled employees, thereby limiting the comparison group for pregnant employees to nonpregnant employees who have suffered a temporary disability. The majority concludes that, despite her temporary disability due to pregnancy, Rhett can be terminated unless Carnegie would not terminate a male employee who was similarly "temporarily" disabled. See Maj. Op. at 11. That analysis rests upon equating a protected, but temporary, condition (pregnancy) with a temporary unprotected disability under the ADA. The ADA does not shield a non-pregnant employee from termination because temporary disabilities are excluded from the ADA. Regulations that were promulgated pursuant to the ADA define disability as:

> (1) A physical or mental impairment that substantially limits one or more of the major life activities of such individual; (2) a record of such an impairment; or (3) being regarded as having such an impairment.

29 C.F.R. S 1630.2(g). "Substantially limits" is defined to mean:

> (i) Unable to perform a major life activity that the average person in the general population can perform; or

> (ii) Significantly restricted as to the condition, manner, or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity.

23

S 1630.2(j)(1). Several factors have been identified to assist in determining whether a particular "disability" is of such severity as to come within the protection intended under the ADA. These factors include:

> (i) The nature and severity of the impairment;

> (ii) The duration or expected duration of the impairment; and

> (iii) The permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment.

S 1630.2(j)(2). "Disabilities" that are temporary do not, by definition, rise to the level of substantially limiting a major life function. See Rogers v. International Marine Terminals, Inc., 87 F.3d 755, 758 (5th Cir. 1996) ("[T]emporary conditions that are not chronic usually do not rise to the level of a `disability.' ") and (Taylor v. Dover Elevator Systems, Inc., 917 F.Supp. 455, 461 (N.D. Miss. 1996) ("[T]emporary injuries with no permanent effects are ordinarily not considered disabilities under the ADA.") (citing Evans v. City of Dallas, 861 F.2d 846, 852-53 (5th Cir. 1988); Rakestraw v. Carpenter Co., 898 F.Supp. 386, 390 (N.D. Miss. 1995); Oswalt v. Sara Lee Corp., 889 F.Supp. 253, 257 (N.D. Miss. 1995), aff'd, 74 F.3d 91 (5th Cir. 1996)).

However, just as temporary disabilities are excluded from the protections of the ADA by definition, temporary pregnancy-related conditions are explicitly covered by Title VII's prohibition against sex discrimination under the PDA. Accordingly, the protection afforded pregnancy-related conditions can not be equated with that afforded temporary disabilities merely because pregnancy is temporary. To do so under the facts of this case is contrary to the mandate of the statute, effectively amends the PDA and forces Rhett to rely upon the ADA which provides no protection for pregnancy related conditions because of their temporary nature.

The majority relies on Rogers and Sanders v. Arneson Prods., Inc., 91 F.3d 1351, 1354 (9th Cir. 1996), cert. denied, 117 S.Ct. 1247, 137 L.Ed.2d 329 (1997), to

24

substantiate its claim that the temporarily disabled employee resides outside of statutory protection--regardless of whether the temporary disability is due to pregnancy. See Maj. Op. at 11. In Rogers, an employee ("Rogers") sued under the ADA when he was laid off pursuant to a reduction in force ("RIF "). Rogers had been absent because of health problems related to an ankle surgery. The court held that Rogers was not protected by the ADA because he was not "disabled" within the meaning of the statute. "In sum, Rogers' ankle afflictions were temporary and did not constitute a permanent disability . . . . The EEOC regulations concur, that `temporary, non-chronic impairments of short duration, with little or no long term or

permanent impact, are usually not disabilities.' " 87 F.3d at 759 (quoting 29 C.F.R. S 1630.2(j) (Appendix)). However, the fact that they are not "disabilities" under the ADA does not mean that they are not protected under the PDA, if they are pregnancy-related.

Similarly, in Sanders, employee Sidney Sanders ("Sanders") was terminated while on leave for a cancer-related psychological disorder. While he was away other employees assumed his responsibilities and employer Anreson Products decided to replace Sanders rather than allow him to return at the end of his sick leave. Although Sanders suffered from cancer, he conceded that his absence was related only to his psychological disorder that was temporary. Accordingly, the court framed the issue before it as "whether Sanders' temporary psychological impairment qualifies as a disability under the ADA." Id. at 1353. The court held that it did not because that impairment did not "substantially limit" a major life function. Id.

If Congress intended to equate pregnancy with a temporary disability under the ADA, it afforded pregnant women precious little protection when it enacted the PDA. Pregnancy is by its nature temporary. Holding that it is therefore the equivalent of a "temporary disability" is hardly consistent with "the social policies and aims to be furthered by Title VII and filtered through the phrase `to discriminate' contained in [that Act]" Gilbert, 429 U.S. at 155 (Brennan, J., dissenting). Accordingly, we can only give effect to the

25

intent behind this statute by viewing the term "temporarily disabled" as it applies to pregnancy as referring to the duration of the disability, not to the quality of it.

The majority also relies upon Troupe v. May Dept. Stores Co., 20 F.3d 734, 738 (7th Cir. 1994). However, I am not persuaded by the reasoning of Troupe and believe that we should be guided instead by Smith v. F.W. Morse & Co., Inc., 76 F.3d 413 (1st Cir. 1996).

III. TROUPE v. MAY DEP'T STORES CO.

In Troupe, pregnant employee Kimberly Hern Troupe was fired from a Lord & Taylor department store for tardiness due to pregnancy. Troupe sued her employer, May Department Stores (doing business as Lord & Taylor), alleging illegal sex discrimination under Title VII. The district court granted Lord & Taylor's motion for summary judgment and Troupe appealed. On appeal, the Court of

Appeals for the Seventh Circuit affirmed, noting that "[t]he great, the undeniable fact is the plaintiff's tardiness." Id. at 737. The court analogized the plaintiff's plight to that of a hypothetical Black employee who is fired after a kidney transplant because the employer either wants to avoid paying the employee while on sick leave or doubts that the employee will return. The court reasoned that, infiring the Black employee, the employer may be breaking a contract, but it would not be violating Title VII's protections against racial discrimination as long as the employer would also fire a similarly situated White employee.3 Id. at 738. The failure of the Troupe analogy, however, is that absence from work is not endemic to a protected racial trait. Absence is,

_____

3. The Seventh Circuit notes that "[e]mployers can treat pregnant women as badly as they treat nonpregnant employees, even to the point of `conditioning the availability of an employment benefit on an employee's decision to return to work after the end of the medical disability that pregnancy causes.' " Troupe, 20 F.3d at 738 (quoting Maganuco v. Leyden Community High School Dist. 212, 939 F.2d 440, 445 (7th Cir. 1991). In treating pregnant women as badly as other nonpregnant employees, an employer cannot, however, impose policies that disparately impact pregnant women because of their pregnancy. See Maganuco, 939 F.2d at 445.

26

however, endemic to "pregnancy, childbirth, or related medical conditions." S 2000e(k). Indeed, the historical underpinnings of Title VII suggest that it was the fear that women would get pregnant and be absent from their jobs that was, at least in part, responsible for the longstanding discrimination against women (especially younger women) in the workplace.

As noted above, employers have assumed that female employees may become pregnant and that pregnancy would make them unavailable for work. See Gilbert, 429 U.S. at 150 n.1 (Brennan, J., dissenting) ("General Electric's disability program was developed in an earlier era when women openly were presumed to play only a minor and temporary role in the labor force. As originally conceived in 1926, General Electric offered no benefit plan to its female employees because `women did not recognize the responsibilities in life, for they were probably hoping to get married soon and leave the company.' ") (quoting D. Loth, Swope, G.E.: Story of Gerard Swope and General Electric in American Business (1958)). Yet, here the majority finds that "[i]t is not a violation of the PDA for an employer to consider an employee's absence on maternity leave in making an adverse employment decision if it also would have

considered the absence of an employee on a different type of disability leave in the same way." Maj. Op. at 14. This is a simplistic interpretation of the PDA and the EEOC guidelines. In a different Title VII context, the Supreme Court noted that interpreting the prohibitions of Title VII to only prohibit overt intentional discrimination would leave employers free to enact facially neutral policies based on factors that were a proxy for race and thereby circumvent Title VII's protection. See Griggs v. Duke Power, 401 U.S. 424, 430, 91 S.Ct. 849, 853, 28 L.Ed.2d (1971). The approach taken in Troupe, under the PDA, and adopted by the majority here, suffers from the same infirmity.

It is jurisprudential sleight of hand to suggest that the PDA does not require that pregnant women be treated better than their male counterpart. That is a misleading statement of the issue. Thus, the court in Troupe misses the analytical mark when it states that "[e]mployers can treat pregnant women as badly as they treat similarly

27

affected but nonpregnant employees," 20 F3d at 738, unless it defines "similarly affected" employees as other employees having a protected trait that is endemic to the behavior at issue. However, Troupe fails to do so and assumes that the pregnant employee is the "equal" of her nonpregnant coworker. Similarly, the majority erroneously concludes that "the PDA does not require that employers treat pregnant employees better than other temporarily disabled employees." See Maj. Op. at 8.

Relying upon Hazen Paper Company v. Biggins, 507 U.S. 604, 113 S.Ct. 1701, 123 L.Ed.2d 338 (1993), the majority states that "[t]he Supreme Court has held that under the Age Discrimination in Employment Act an employer must ignore an employee's age in certain employment decisions, but not any other characteristics such as pension expense." Maj. Op. at 8. However, I believe that Hazen Paper requires that we reject Troupe. In Hazen Paper, a 62 year old employee sued his employer, alleging that he had been terminated based upon age discrimination, in violation of the Age Discrimination in Employment Act ("ADEA"), 26 U.S.C. S 626, and the Employment Retirement Income Security Act ("ERISA"), 29 U.S.C. S 1140. A jury found for the employee on both claims, and the employee appealed. The Court of Appeals for the First Circuit affirmed, relying heavily on evidence that the plaintiff had been fired in order to prevent his pension from vesting. The court determined that the jury could have concluded that "age was inextricably intertwined with the decision to fire [the plaintiff]. If it were not for [his] age . . . his pension rights

would not have been within a hairbreadth of vesting," 953 F.2d 1405, 1412 (1st Cir. 1992), and he would not have been fired. The Supreme Court reversed as to the ADEA claim. The court reasoned that firing an older employee to prevent pension benefits from vesting based on years of service does not amount to "willful" age discrimination under the ADEA. 507 U.S. at 608. The Court stated,"[W]e now clarify that there is no disparate treatment under the ADEA when the factor motivating the employer is some feature other than the employee's age." Id. at 609. The case before it was a disparate treatment case and the Court concluded that "a disparate treatment claim cannot succeed unless the employee's protected trait actually

28

played a role in that process and had a determinative influence on the outcome." Id. at 611.

> Disparate treatment, thus defined, captures the essence of what Congress sought to prohibit in the ADEA. It is the very essence of age discrimination for an older employee to be fired because the employer believes that productivity and competence decline with old age. . . .
>
> Thus the ADEA commands that `employers are to evaluate [older] employees . . . on their merits and not their age.' The employer cannot rely on age as a proxy for an employee's remaining characteristics, such as productivity, but must instead focus on those factors directly.
>
> When the employer's decision is wholly motivated by factors other than age, the problem of inaccurate and stigmatizing stereotypes disappears. This is true even if the motivating factor is correlated with age, as pension status typically is . . . . Because age and years of service are analytically distinct, an employer can take account of one while ignoring the other, and thus it is incorrect to say that a decision based on years of service is necessarily `age based.'

507 U.S. at 610-611.

Pregnancy and absence are not, however, analytically distinct, and an employer can not punish for the absence occasioned by pregnancy under Title VII. As noted above, that statute states that it is an unlawful employment practice to "discharge any individual . . . or otherwise discriminate . . . because . . . of sex," 42 U.S.C. S 2000e-2(a)(1), and, after the PDA, that includes discrimination "on

the basis of pregnancy . . . or related medical conditions." 42 U.S.C. S 2000e(k). That protection is meaningless unless it is intended to extend to the "temporary" absence from employment that is unavoidable in most pregnancies. Thus, the absence endemic to pregnancy, unlike factors that may sometimes be a proxy for age, has to be protected under the facts of this case. In Hazen Paper, it was the employee's years of service, not his age, that occasioned the vesting of his pension. The Court was very careful to note that

29

> [W]e do not consider the special case where an employee is about to vest . . . as a result of his age, rather than years of service, and the employer fires the employee in order to prevent vesting. That case is not presented here. Our holding is simply that an employer does not violate the ADEA just by interfering with an older employee's pension benefits that would have vested by virtue of years of service.

507 U.S. at 613. I believe that Rhett's situation under the PDA is much closer to the situation of an employee whose pension is vesting because of age than to the plight of the plaintiff in Hazen Paper. Accordingly, the holding in Hazen Paper does not assist the majority nearly as much as first appears.[4]

"[I]n using the broad phrase `women affected by pregnancy, childbirth and related medical conditions,' the [PDA] makes clear that its protection extends to the whole range of matters concerning the childbearing process." H.R. Rep. 95-948 (emphasis added). The holding in Troupe, and the majority's holding here, remove a substantial portion of the protection Congress intended. Troupe's position was terminated because of conditions related to pregnancy (tardiness occasioned by her morning sickness). I do not understand, therefore, why she was not terminated "because of . . . her pregnancy," S 2000e(k), in violation of Title VII.

I believe that we should reject the holding in Troupe, and
_____

4. I do not mean to suggest by this that the PDA requires an employer to necessarily take affirmative steps to make it easier for a pregnant employee to work. See Troupe, 20 F.3d at 738 ("The Pregnancy Discrimination Act does not . . . require employers to . . . take . . . steps
to make it easier for pregnant women to work."). The PDA does not provide for accommodation as does the ADA.

Nor do I suggest that an employee who is pregnant can not be fired for reasons that are not occasioned by pregnancy. For example, if Carnegie decided, in good faith, to eliminate everyone with a certain salary grade based upon its business judgment, Rhett could be terminated if she was at that salary grade whether she was on pregnancy leave or not because the termination would not be based upon a factor endemic to her pregnancy.

adopt instead the analysis set forth in Smith, 76 F.3d 413. There, a female employee ("Smith") worked for a small company that was undergoing restructuring. She informed the owner of the company that she was pregnant and would be taking maternity leave. Although the company had no maternity leave policy, Smith was assured that her job was secure and the company would simply divide her duties amongst its remaining employees in her absence. The company made this commitment even though it expected her absence to cause "the sky to fall." Id. at 418. The company also held regular "reality check" meetings in the hope that they could minimize the impact of the absence of such a key employee. However, to the company's great surprise the sky did not fall. In fact, "the plant functioned very well," id. at 419, in Smith's absence. Soon after Smith gave birth, she informed the general manager, Maryann Guimond, that she wished to return to work a week earlier than planned. At that time, Guimond made inquiries of Smith and Smith's sister (who also worked for the company) regarding Smith's plans to have children in the future. Days later, Guimond determined that Smith's position was superfluous and eliminated it. Smith's duties were then given to another employee who had been functioning as the operations manager.

Smith sued, alleging, among other things, violation of Title VII. The Title VII claim was decided in a bench trial in the district court, and that court entered judgment for the employer as a matter of law. Smith appealed, and the Court of Appeals for the First Circuit affirmed. Smith argued that the company had violated Title VII because her absence on pregnancy leave afforded the company the opportunity to learn that it could afford to eliminate her position. The court disagreed because it concluded that the employer would have eliminated the position regardless of Smith's pregnancy, and agreed with the employer's argument that "even if Smith had not been on maternity leave she would have been flattened by the downsizing steamroller." Id. at 419. The court reasoned that

>        [T]here is little doubt that an employer, consistent with
>        its business judgment, may eliminate positions during

the course of a downsizing without violating Title VII

> even though these positions are held by members of
> protected groups (pregnant women included)" (citing
> LeBlanc v. Great Am. Ins. Co., 6 F.3d 836, 844-45 (1st
> Cir. 1993), cert. denied, 511 U.S. 1018, 114 S.Ct.
> 1398, 128 L.Ed.2d 72 (1994); Goldman v. First Nat'l
> Bank, 985 F.2d 1113, 1118-19 (1st Cir. 1993);
> Montana v. First Fed. Sav. & Loan Ass'n, 869 F.2d 100,
> 105, 107 (2d Cir. 1989); Dister v. Continental Group,
> Inc., 859 F.2d 1108-1115 (2d Cir. 1988); Pearlstein v.
> Staten Island Univ. Hosp., 886 F.Supp. 260, 268-69
> (E.D.N.Y. 1995)) . . . . [T]he flip side of the coin,
> however, is that an employer who selectively cleans
> house cannot hide behind convenient euphemisms
> such as "downsizing" or "streamlining." Whether or not
> trimming the fat from a company's organizational chart
> is a prudent practice in a particular business
> environment, the employer's decision to eliminate
> specific positions must not be tainted by a
> discriminatory animus.

Id. at 422 (citing Goldman, 985 F.2d at 1118 n.4; Maresco
v. Evans Chemetics, 964 F.2d 106, 111 (2d Cir. 1992);
Mesnick, 950 F.2d at 825; Pearlstein, 886 F.Supp. at 268-
69.). The court held that the "employer may discharge an
employee while she is on a pregnancy-induced leave so long
as it does so for legitimate reasons unrelated to her
gravidity." Id. at 424. Smith's employer had selected her
merely because it realized that her position was not nearly
as valuable as her supervisors previously believed. The fact
that her absence on maternity leave afforded the employer
an opportunity to learn just how expendable her position
was did not mean that she was terminated "because of her
pregnancy."

However, and most significantly for purposes of our
analysis, the court also stated:

> Title VII mandates that an employer must put an
> employee's pregnancy (including her departure on
> maternity leave) to one side in making its employment
> decisions -- but the statute does not command that an
> employer bury its head in the sand and struthiously
> refrain from implementing business judgments simply
> because they affect a parturient employee.

Id. at 424 (citing Troupe, 20 F.3d at 738) (emphasis added). The court added that "[a]t bottom, Title VII requires a causal nexus between the employer's state of mind and the protected trait (here, pregnancy)." Id. at 425. In Smith, the nexus did not exist because the decision to eliminate the employee's job was based upon the importance (or lack thereof) of the job. Here, however, the decision to eliminate Rhett's job was based solely upon her pregnancy related absence. That causal nexis runs afoul of Title VII's prohibition of sex discrimination.

Carnegie clearly did not put Rhett's departure on maternity leave to one side when deciding to terminate her. Rhett's absence from work was so inextricably intertwined with pregnancy, her protected trait, as to make the two inseparable. In its "theory of transitivity," the majority separates the events in this case into discrete entities that suggest the causal relationship between Rhett's pregnancy and her termination. The majority too easily rejects this position. See Maj. Op. at 8 ("This view eliminates Rhett's theory of transitivity, that if A (termination) is caused by B (absence) which is caused by C (pregnancy), then C causes A.").

IV. TERMINATION BECAUSE OF PREGNANCY

An employer can not insulate itself from the reach of Title VII by an action that appears neutral, yet has the functional effect of disparately treating an individual based upon a protected trait. See Griggs, 401 U.S. at 430. Carnegie's action is the functional equivalent of terminating Rhett because she was pregnant. See Teahan v. Metro-North Commuter R.R. Co., 951 F.2d 511 (2d Cir. 1991).

In Teahan, an employee suffering from alcoholism brought an action against his employer alleging that his discharge for excessive absenteeism was in violation of S 504 of the Rehabilitation Act of 1973, 29 U.S.C. S 794, because his absences had been caused by that disease. Summary judgment was entered in favor of the employer because the district court concluded that there was no issue of material fact as to whether Teahan "was terminated `solely by reason of ' his handicap." Id. at 514. The district

court concluded that the employer "had not relied on Teahan's handicap . . . [and had] a nondiscriminatory reason for firing him (excessive absenteeism)." Id. Teahan appealed.

On appeal, Teahan argued that "because the ground upon which he was terminated was his excessive absenteeism, and since his absenteeism was `caused by' his substance abuse problem, the district court improperly shifted the burden to him to present evidence of pretext." Id. The Court of Appeals for the Second Circuit agreed, stating that "it does not inevitably follow that termination for conduct resulting from a handicap is not termination `solely by reason of ' that handicap."5 Id. at 515. Indeed,"an employer `relies' on a handicap when it justifies [its employment decision] based on conduct caused by that handicap."6 Id. Because the district court erred in concluding that Teahan had not established that he was fired "solely by reason of his handicap," his employer never had to satisfy its burden of "demonstrating that[Teahan's handicap] was relevant to the job qualifications." Id. at 515. Accordingly, the court remanded the case for further proceedings.7 Similarly, in Cushing v. Moore, 970 F.2d

_____

5. The "solely by reason of" inquiry, the court explained, is "designed to weed out [ ] claims where an employer can point to conduct or circumstances that are causally unrelated to the plaintiff's handicap." Id. at 516 (emphasis added). In the context of the PDA, the analogue is the "because of or on the basis of pregnancy" inquiry.

The court accepted that the plaintiff's excessive absences were "caused by" his alcoholism because its review on appeal required that it examine all facts in the light most favorable to Teahan. The court recognized, however, that "the causal connection between absenteeism and alcoholism is ordinarily a question of fact." Teahan, 951 F.2d at 515.

6. Under the Rehabilitation Act, "[t]he question then becomes whether the employee is qualified despite his or her handicap to perform the essential functions of the job." Id. The employer bears that burden: "[A]fter complainant proves a prima facie case, the employer is required to rebut the inference that the handicap was improperly considered by first demonstrating that it was relevant to the job qualifications." Id. at 515.

7. Other courts of appeals have refused to adopt Teahan's rationale. See e.g., William v. Widnall, 79 F.3d 1003 (10th Cir. 1996); Maddox v.

34

1103, 1108 (2nd Cir. 1992), the court stated that "the key determination becomes the factual issue of whether an employee's conduct (such as absenteeism), which forms the articulated basis for a job termination, is actually caused by a handicap (such as substance abuse)" (citing Teahan, 951 F.2d at 517; Hogarth v. Thornburgh, 833 F.Supp. 1077,

1085 (S.D.N.Y. 1993) ("[I]f a handicap manifests itself in certain behavior, and an employee is discharged because of that behavior, he has been terminated `solely by reason of ' the handicap."); and Ambrosino v. Metropolitan Life Insur. Co., 899 F.Supp. 438, 444 (N.D.Cal. 1995) (The court chose to follow the line of cases holding that "termination based on conduct caused by chemical dependency and status which results from the dependency and/or the conduct caused by the dependency is termination based on the disability of chemical dependency."). However, that consideration is not present here, and I believe that this matter should be remanded for a determination of whether Rhett would have been selected for termination based upon factors other than her absence. Although it is for the employer, and not a court, to determine how best to select those positions that will be eliminated in a reduction in force, Title VII requires this employer to adopt criteria that put Rhett's pregnancy-related absence aside and allow for an individualized determination driven by her own capabilities.

_____

University of Tennessee, 62 F.3d 843 (6th Cir. 1995). However, in all cases, the employee had exhibited either egregious or criminal conduct. See e.g., Maddox, 62 F.3d at 845 (assistant coach at University of Tennessee fired because of the bad publicity that the university was subjected to after he was arrested for DUI). Because of the nature of the conduct involved, these courts were unwilling to"adopt an interpretation of the [Rehabilitation Act] which would require an employer to accept egregious behavior by [a disabled employee] when that same behavior, exhibited by a nondisabled employee, would require termination." Williams, 79 F.3d at 1007. Thus, "[a]t first blush, it may appear that the Second Circuit is out of synchronization with the others. However, distinction lies in the categorization of the conduct . . . . [In the cases rejecting Teahan,] the conduct [at issue] is . . . misconduct." Taylor, 917 F.Supp. at 462 (emphasis added). Rhett's case does not implicate the concerns of those courts that have rejected Teahan.

35

V. CONCLUSION

For the reasons stated above, I would reverse the decision of the district court and remand this matter to the bankruptcy court for a determination of whether Rhett would have been terminated had her pregnancy-related absence been put aside.

A True Copy:
Teste:

Clerk of the United States Court of Appeals
for the Third Circuit