877 A.2d 1233

CHRISTINA M. GERETY AND JOHN GERETY, HUSBAND AND WIFE, PLAINTIFFS–RESPONDENTS, v. ATLANTIC CITY HILTON CASINO RESORT, DEFENDANT–APPELLANT, AND MARY BURUSS, RACHEL BOGATIN, AND JOHN DOES 1 THROUGH 50, INCLUSIVE, FICTITIOUS NAMED DEFENDANTS, JOINTLY, SEVERALLY, AND IN THE ALTERNATIVE, DEFENDANTS.

Argued January 18, 2005—Decided July 25, 2005.

*David W. Garland,* argued the cause for appellant (*Sills Cummis Epstein & Gross* and *Grotta, Glassman & Hoffman,* attorneys; *Mr. Garland* and *Jerrold J. Wohlgemuth,* on the brief).

*Clifford L. Van Syoc,* argued the cause for respondents (*Van Syoc Chartered,* attorneys; *Mr. Van Syoc, James E. Burden* and *Sebastian B. Ionno II,* on the briefs).

*John J. Sarno* and *Mark A. Saloman,* argued the cause for *amicus curiae,* Employers Association of New Jersey (*Proskauer Rose,* attorneys; *Edward Cerasia II,* of counsel; *Mr. Sarno, Mr. Saloman, Mr. Cerasia* and *Bryant A. Roman,* on the brief).

Justice LaVECCHIA delivered the opinion of the Court.

Both state law, *N.J.S.A.* 34:11B–1 to –16, and federal law, 29 *U.S.C.A.* § 2612, require that a qualifying employer must provide its employees with twelve weeks of unpaid leave for certain family and medical reasons during a consecutive twelve month period. Defendant Atlantic City Hilton Casino Resort provides its employees with twenty-six weeks of unpaid family and medical leave during a consecutive twelve month period, or more than twice as much as required by law. In the implementation of its leave

policy, defendant maintains a strict, no-exceptions standard: family and medical leave during a twelve consecutive month period cannot exceed twenty-six weeks; and if an employee takes more than the maximum twenty-six-weeks of leave, that employee is terminated from employment but is eligible for re-hire.

In this case, an employee exceeded her maximum twenty-six-weeks leave due to a difficult pregnancy and was terminated pursuant to defendant's policy. We must determine whether defendant's leave policy violated the New Jersey Law Against Discrimination (LAD), *N.J.S.A.* 10:5–1 to –42, because it did not provide more than twenty-six weeks leave to the employee. Plaintiff essentially asks us to carve out a special exception for pregnancy under the LAD, treating it differently from other medical conditions and illnesses. We hold that, because defendant's leave policy was applied non-discriminatorily and not subject to exception, application of that policy to this employee does not create a violation of the LAD.

## I.

Plaintiffs, Christina and John Gerety,[1] were employed by the Atlantic City Hilton Casino Resort (formerly Bally's Grand, currently GNOC Corp. t/a The Atlantic City Hilton) when Christina became pregnant with twins in 1997. Both had worked for years for Bally's Grand and their employment continued under Hilton. Christina learned that she was expecting in September 1997. Although she planned to work during her pregnancy, she was unable to do so for medical reasons. On October 2 and 3, illness associated with the pregnancy forced her absence from work. Hilton paid her for that absence and charged the days as leave available pursuant to the Family and Medical Leave Act (FMLA), 29 *U.S.C.A.* § 2612(a)(1)(D). Because of medical concerns related to her pregnancy and on the advice of her physician, Dr. Bredin, Christina requested a leave of absence from work starting October

---

[1] When used in the singular, "plaintiff" refers to Christina.

5, 1997, and continuing through December 1, 1997. Christina later extended her leave request through February 1, 1998, again on Dr. Bredin's advice.

Hilton approved both periods of leave, classifying Christina's absence through December 26, 1997, as FMLA leave and the remainder as leave available through its medical leave policy. Different classifications were used because Christina had exhausted her allotted amount of FMLA leave during December. As it turned out, Christina required hospitalization during her leave. A perinatologist attending to her discovered a health problem in respect of one of the twins she was carrying. There is no dispute that bona fide medical concerns required Christina to request that her leave be extended for the duration of her pregnancy. Her anticipated due date was in May.

This appeal focuses on Hilton's denial of Christina's request that her leave be extended beyond the limits of Hilton's policy so as to accommodate the entirety of her pregnancy. According to Hilton, Christina was entitled to a total of six months medical leave, which she exhausted on April 1, 1998, and there was no other category of leave available to her after that date. Thus, citing its policy, Hilton informed Christina that as of April 1, 1998, she would reach the "maximum allowable" amount of medical leave and that her employment would be terminated if she did not return to work after that date. Consistent with that policy, she would remain eligible for rehire despite the termination of her employment. If rehired, however, she would no longer have the seniority that she had accrued prior to her termination.

In total, Christina was on medical leave for 182 days (26 weeks), the maximum allowable for any comparable Hilton employee. Her employment was terminated effective April 2, 1998, when, consistent with her doctor's instruction, she did not return to work. On April 14, 1998, Christina went into labor five-weeks prematurely and the next day delivered twin daughters by emergency C-section. Thirteen days elapsed between the exhaustion of Christina's medical leave and the twins' birth on April 15, at

which time she would have been entitled to leave to care for the infants pursuant to the New Jersey Family Leave Act (NJFLA), *N.J.S.A.* 34:11B–1 to –16.

In September, Christina and John filed a complaint with the Equal Employment Opportunity Commission (EEOC) and the New Jersey Division of Civil Rights (DCR) alleging gender discrimination. The EEOC closed its file in February, 1999, having concluded that Hilton had not committed any violation of law. Plaintiffs then filed a civil complaint in Superior Court, naming Hilton and two of its employees as defendants. Plaintiffs alleged gender discrimination in violation of the LAD, wrongful termination in violation of public policy, and intentional infliction of emotional distress as to Christina. The complaint also alleged that Hilton took retaliatory action against John, depriving him of promotions and taking other adverse employment action against him.[2]

Hilton's motion for summary judgment, asserting that it merely adhered to its facially neutral leave policy, was denied. The motion court found Hilton's policy to be discriminatory. The court also declined to dismiss John's retaliation claim. The court did dismiss plaintiffs' public policy claim on the basis that it was encompassed within the LAD claim and, therefore, was preempted. Plaintiffs' intentional infliction of emotional distress claim and *per quod* claims also were dismissed. Finally, the court granted summary judgment to the individual defendants as to whom plaintiffs had not opposed the entry of summary judgment. With only the LAD claims remaining, Hilton moved for reconsideration, which was denied. Hilton filed a motion for leave to appeal and for a stay with the Appellate Division. Both were

---

[2] After the filing of the administrative complaint, John alleges that he repeatedly sought a promotion, that one of the positions he sought was required by Hilton's corporate policy to be filled by an in-house employee, that although told he was the highest rated in-house applicant and was fully qualified for the position, Hilton hired an outside person for the job. Plaintiffs also included a *per quod* claim.

denied. We then granted Hilton's motion for leave to appeal *nunc pro tunc. Gerety v. Atlantic City Hilton Casino Resort*, 181 *N.J.* 541, 859 *A*.2d 687 (2004).

## II.

The LAD was enacted in 1945 as an exercise of the State's police powers. *See N.J.S.A.* 10:5–2; *David v. Vesta Co.*, 45 *N.J.* 301, 212 *A*.2d 345 (1965). In *N.J.S.A.* 10:5–3, the statute's findings and declarations section, the Legislature set forth its opposition to the practice of discrimination against members of the statute's protected groups, stating that

[t]he Legislature finds and declares that practices of discrimination against any of its inhabitants, because of race, creed, color, national origin, ancestry, age, sex, affectional or sexual orientation, marital status, familial status, liability for service in the Armed Forces of the United States, disability or nationality, are matters of concern to the government of the State, and that such discrimination threatens not only the rights and proper privileges of the inhabitants of the State but menaces the institutions and foundation of a free democratic State....

The general requirement of equal treatment for members of the statute's protected classes is contained in *N.J.S.A.* 10:5–4:

All persons shall have the opportunity to obtain employment, and to obtain all the accommodations, advantages, facilities, and privileges of any place of public accommodation, publicly assisted housing accommodation, and other real property without discrimination because of race, creed, color, national origin, ancestry, age, marital status, affectional or sexual orientation, familial status, disability, nationality, sex or source of lawful income used for rental or mortgage payments, *subject only to conditions and limitations applicable alike to all persons.*

[Emphasis added].

Further, in the employment context, the LAD details the practices that constitute "an unlawful employment practice, or ... unlawful discrimination." *N.J.S.A.* 10:5–12. Specifically, *N.J.S.A.* 10:5–12 provides in pertinent part:

It shall be an unlawful employment practice, or, as the case may be, an unlawful discrimination:

a. For an employer, because of race, creed, color, national origin, ancestry, age, marital status, domestic partnership status, affectional or sexual orientation, genetic information, sex, disability or atypical hereditary cellular or blood trait of any individual, ..., to refuse to hire or employ or to bar or to discharge or require to retire, unless justified by lawful considerations other than age, from employment

such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment.[3]

In determining whether members of the classes protected by the LAD have been subjected to unlawful discrimination in an employment setting, we have looked to "the substantive and procedural standards established under federal law" for general guidance. *See Viscik v. Fowler Equipment Co., Inc.,* 173 *N.J.* 1, 13, 800 *A.*2d 826 (2002); *see also Lehmann v. Toys 'R' Us, Inc.,* 132 *N.J.* 587, 601, 626 *A.*2d 445 (1993) (noting that federal standards have been applied with flexibility). In respect of whether unequal treatment has occurred, intentionally or as a result of a policy's impact on members of a protected group, two approaches have been generally accepted. The United States Supreme Court has recognized two theories of relief under Title VII—disparate treatment and disparate impact—and we acknowledge both as cognizable under the LAD. *See Peper v. Princeton Univ. Bd. of Trustees,* 77 *N.J.* 55, 81–82, 389 *A.*2d 465 (1978). Generally stated, we distinguish between disparate treatment and disparate impact thusly:

"Disparate treatment" . . . is the most easily understood type of discrimination. The employer simply treats some people less favorably than others because of their race, color, religion, sex, or national origin. Proof of discriminatory motive is critical, although it can in some situations be inferred from the mere facts of differences in treatment. *See, e.g., Village of Arlington Heights v. Metropolitan Housing Dev. Corp.,* 429 *U.S.* 252, 265–66, 97 *S.Ct.* 555, 50 *L.Ed.*2d 450. Undoubtedly disparate treatment was the most obvious evil Congress had in mind when it enacted Title VII.

Claims of disparate treatment may be distinguished from claims that stress "disparate impact." The latter involves employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity. . . . Proof of discriminatory motive, we have held, is not required under a disparate impact theory.

[*Ibid.* (citing *Int'l Brotherhood of Teamsters v. United States,* 431 *U.S.* 324, 335, 336 n. 15, 97 *S.Ct.* 1843, 1854–55 n. 15, 52 *L.Ed.*2d 396, 415 n. 15 (1977)) (citations omitted).]

---

[3] Since the date of Christina's termination, *N.J.S.A.* 10:5–12 was amended by *L.* 2002, *c.* 82; those amendments, however, do not affect our analysis.

In respect of a disparate treatment claim, we have noted the inherent difficulty of proving discriminatory intent and have conformed our analysis in substantial measure to the burden-shifting framework enunciated in *McDonnell Douglas Corp. v. Green*, 411 *U.S.* 792, 93 *S.Ct.* 1817, 36 *L.Ed.*2d 668 (1973). *See Zive v. Stanley Roberts, Inc.*, 182 *N.J.* 436, 447, 867 *A.*2d 1133 (2005). To prove a *prima facie* case of discrimination, the plaintiff must demonstrate that he or she (1) belongs to a protected class; (2) applied for or held a position for which he or she was objectively qualified; (3) was not hired or was terminated from that position; and (4) the employer sought to, or did fill the position with a similarly-qualified person. *Andersen v. Exxon Co.*, 89 *N.J.* 483, 492, 446 *A.*2d 486 (1982). The burden then shifts to the employer to prove a legitimate, non-discriminatory reason for the employment action. *Id.* at 493, 446 *A.*2d 486. Plaintiff can respond by showing the employer's proffered reason was merely pretext for the discrimination. *Ibid.* Despite our resort to the *McDonnell Douglas* framework, we have recognized that "[t]he *McDonnell Douglas* test is not designed for rigid application." *Viscik, supra,* 173 *N.J.* at 14, 800 *A.*2d 826. Instead, we have modified the test, as appropriate, to address the specific context involved. *See Zive, supra,* 182 *N.J.* at 450, 867 *A.*2d 1133 (explaining that *McDonnell Douglas* framework has been altered for termination cases, *see, e.g., Clowes v. Terminix Int'l, Inc.*, 109 *N.J.* 575, 538 *A.*2d 794 (1988), and further clarifying second prong of test when used to assess whether terminated plaintiff has established *prima facie* case).

By contrast, a disparate impact claim does not require the plaintiff to demonstrate proof of the employer's discriminatory motive. *Peper, supra,* 77 *N.J.* at 82, 389 *A.*2d 465. Rather, a plaintiff must show that a facially neutral policy "resulted in a significantly disproportionate or adverse impact on members of the affected class." *United Prop. Owners Ass'n of Belmar v. Borough of Belmar*, 343 *N.J.Super.* 1, 47, 777 *A.*2d 950 (App.Div.) (citation omitted), *certif. denied,* 170 *N.J.* 390, 788 *A.*2d 774 (2001).

The proof required for a finding of proscribed disparate impact is informed by the requirements set forth in 42 *U.S.C.A.* § 2000e–2(k). *See Esposito v. Edison,* 306 *N.J.Super.* 280, 289–90, 703 A.2d 674 (1997), *certif. denied,* 156 *N.J.* 384, 718 A.2d 1212 (1998).

Plaintiffs have pled both theories. We turn, then, to examine plaintiffs' claims of unequal treatment under those two theories.

### III.

As far as the record permits us to conclude, it appears that the trial court analyzed and resolved the motion for summary judgment on Christina's discrimination claims exclusively under a disparate impact analysis. And, in doing so, the court assumed that Christina was treated no differently than other non-pregnant male and female Hilton employees who had their employment terminated when their medical leave allowance had been exhausted and they did not return to work. At oral argument, we were not informed otherwise. Indeed, Hilton specifically asserted that plaintiffs had presented no evidence of different treatment. Thus, as far as this record shows, plaintiff was treated no differently than other non-pregnant employees of Hilton whose leave had expired and who were terminated for not returning to work notwithstanding a valid medical inability to do so. Hence we turn to the disparate impact analysis.

### A.

Hilton's employee policy authorizes two types of leave: that available pursuant to the FMLA and the NJFLA, as well as that provided by the terms of its own medical leave policy. The policy in effect at the time of Christina's medical leave addressed calendar years 1996, 1997, and 1998, and applied to non-contract (that is, non-union) and non-probationary employees. It provided in pertinent part:

1. The Federal Family and Medical Leave Act of 1993 (FMLA) and the New Jersey Family Leave Act (NJFLA) require that [Hilton][4] provide eligible employ-

---

[4] Hilton failed to remove the name "Bally's" and replace it with "Hilton" in the handbook that it provided to its employees. Therefore, the policy set forth in

ees with up to twelve (12) weeks of unpaid, job-protected leave within a twelve (12) month cycle for certain family and medical reasons detailed below. Depending upon the circumstances, an employee may be entitled to take up to a maximum of twenty-four (24) weeks of leave for certain medical and family reasons in any twenty-four (24) month cycle.... To determine whether an employee has any family or medical leave entitlement, [Hilton] will utilize a twelve (12) month cycle based on the date upon which an employee first takes FMLA or NJFLA leave.

Pursuant to the FMLA and the NJFLA, the Hilton policy recognized the following as reasons for the grant of leave time:

*Family Reasons*

To care for the employee's child after birth or placement for adoption or foster care;

or

To care for the employee's spouse, son, daughter, parent or parent-in-law who has a serious health condition;

or

*Medical Reason*

For a serious health condition of the employee that makes the employee unable to perform his or her job (FMLA only).

Christina's leave was classified as FMLA for the first eighty-two days (12 weeks) of her pregnancy-related disability and was approved by Hilton based on her personal health condition, a clearly enumerated basis for leave under the Hilton policy. Up to that point in time, all parties anticipated Christina's return to her former position without any adverse repercussions.[5] Once

---

the handbook is Hilton's, although "Bally's" name actually appears. For purposes of this opinion, correction has been made to the quoted sections of Hilton's policy.

[5] Hilton's policy expressly provides that employee's taking medical leave may not be penalized:

*Processing Leaves of Absence:*
* * *
2. An employee on FMLA or NJFLA leave will be restored to the same or equivalent position upon his or her return from leave. Where operationally feasible and when warranted by the employee's work record, [Hilton] will restore an employee going on [Hilton] Medical Leave or Personal Leave to his or her original position upon expiration of such leave. [Hilton] however, cannot guarantee that such an employee taking a [Hilton] Medical Leave or

Christina had exhausted all leave under the FMLA, Hilton automatically approved additional leave for her pursuant to its own leave policy. That policy, although not mandated by law and offered by Hilton to its employees on its own initiative, provided:

*[Hilton's] Medical Leave*

1. In the event that an employee is ineligible to receive leave under the FMLA for his or her own serious health condition or an employee exhausts the leave time available under the FMLA for reasons due to the employee's own serious health condition, [Hilton] may provide additional non-paid medical leaves of absence (which include maternity) which may be granted at [Hilton's] sole discretion for a specified duration contingent upon the needs of the department and the nature of the disability, and for a period of time for which the disability may be compensable under state law ("[Hilton's] Medical Leave"). [Hilton's] Medical Leave is in addition to that leave provided under the FMLA and may be granted up to a maximum of twenty-six (26) weeks, inclusive of any leave taken under the FMLA. Multiple medical leaves of absence which collectively amount to more than twenty-six (26) weeks in any twelve (12) month cycle based on the date upon which an employee first takes a leave (inclusive of FMLA) will also result in a denial of leave status or an extension of further personal medical leaves of absence. Request for [Hilton's] Medical Leave in excess of the leave provided under the FMLA will require that any employee advise in writing his or her immediate supervisor as soon as it is known that circumstances exist which may require an additional leave of absence, and the expected duration of the additional leave.

Christina's leave for pregnancy-related medical conditions was extended to the maximum allowable pursuant to the FMLA and Hilton's own policy: she was provided an additional ninety-eight days after the exhaustion of the statutorily mandated leave. Significantly, Hilton's "extension" policy provided that:

2. Under no circumstances will requests for medical leaves of absence which in the aggregate total in excess of twenty-six (26) weeks in a twelve (12) month cycle

---

Personal Leave will be reinstated to his or her position upon the expiration of such leave.

\* \* \*

*Pay and Benefits During Leaves of Absence:*

\* \* \*

5. An employee's length of service will not be interrupted for the duration of a FMLA, NJFLA or [Hilton's] Medical Leave, to a maximum of twenty-six (26) weeks in a twelve (12) month period.

6. An employee's length of service will not be interrupted for the duration of a Personal Leave to a maximum of twelve (12) weeks in a twelve (12) month period.

based on the date upon which an employee first takes a leave (inclusive of FMLA) be granted. . . .

### B.

Christina argues that Hilton's policy visited a disparate impact on women. Plainly, however, the facially neutral policy entitled any eligible (non-probationary, non-contract) Hilton employee suffering from "a serious health condition" that rendered him/her unable to work, to leave both pursuant to the FMLA and pursuant to Hilton's "extension" policy. That policy is gender-neutral: both male and female employees benefited from the generous leave that Hilton permitted for its eligible employees who experienced a serious medical condition. In that respect, that is what the LAD requires.

■ Christina, however, asserts a more refined classification of the gender-based group affected by Hilton's policy—that of "pregnant women"—because only women can become pregnant and, more to the point, only pregnant women can experience high-risk pregnancies that require extended absence from work to rest during a gestation period known to last nine months. For that sub-sub-class, Christina asserts that the LAD requires preferential treatment in the form of an exception from the six-month limit on the amount of medical leave that Hilton provides for its employees because that is the only way that Hilton can avoid negatively affecting women by operation of its gender-neutral leave policy.

■ It goes without saying that only women can become pregnant. And, in their employment actions employers may not discriminate against a female employee because she becomes pregnant. *See, e.g., Castellano v. Linden Bd. of Educ.,* 79 *N.J.* 407, 412, 400 *A.*2d 1182 (1979); *Rendine v. Pantzer,* 141 *N.J.* 292, 298–307, 661 *A.*2d 1202 (1995). That does not mean, however, that an employer discriminates simply by adopting and adhering to a leave policy that even-handedly provides male and female employees alike with lengthy periods of medical leave that nonetheless

may not cover completely the entire period of time that an employee's health needs may require. Although only women can experience pregnancy related medical complications that necessitate long periods of medical leave, there are medical conditions that can strike only men and can create, similarly, the need for extended medical leave.

Testicular cancer is an obvious example. Christina disputes the legitimacy of that example, contending that because cancer can strike women also, it is not a condition unique to a gender. Rather, because pregnancy is unique to women, Christina asserts that Hilton must exempt from its leave policy's maximum limit women who experience pregnancy complications in order to avoid committing gender discrimination. Thus, a pregnant woman requiring extended leave for pregnancy reasons must be provided with more leave time to meet her medical needs, but a woman employee suffering from ovarian cancer need not receive similar accommodation. We reject the reasoning that would allow that proposition. The telling point is that, whatever the cause of the medical condition, Hilton's policy impacts men and women equally and specifically prohibits any exceptions to the maximum limit, a prohibition to which Hilton has adhered without exception.

Although the length of the human gestation period is an indisputable and well-known fact, neither Congress nor the State Legislature require employers to provide pregnant women with up to nine months of medical leave in the case of high risk pregnancies. Rather, Congress requires employers to provide employees with up to twelve weeks of medical leave within a twelve month period for pregnancy related or other medical needs. *See* 29 *U.S.C.A.* § 2612(a)(1)(D). Hilton chose to extend another ninety-eight days of medical leave to its employees, permitting the possibility of a total of twenty-six weeks of medical leave when needed by the employee for his or her medical condition, including those that are pregnancy related, or more than doubling the leave period required by law. Additional leave periods come into play following the birth or adoption of a child. Depending on the size

of an employer's workforce, the Legislature requires that paid or unpaid family leave time be provided to eligible employees following the birth or adoption of a child to permit the employee to care for the new member of the family. *See N.J.S.A.* 34:11B–4 (requiring provision of twelve weeks within twenty-four month period following birth or adoption of child); *see also* 29 *U.S.C.A.* § 2612(a)(1)(A) and (B) (entitling eligible employees to twelve weeks within twelve months of child's birth or adoption).

Furthermore, Congress enacted the Pregnancy Discrimination Act (PDA) as an amendment to Title VII. *See Newport News Shipbuilding and Dry Dock Co. v. E.E.O.C.,* 462 *U.S.* 669, 670 n. 1, 103 *S.Ct.* 2622, 2624 n. 1, 77 *L.Ed.*2d 89, 94 n. 1 (1983). As Justice Marshall noted in *California Federal Savings & Loan Ass'n v. Guerra,* the legislative history of the PDA discloses that "Congress had before it extensive evidence of discrimination against pregnancy" and that

> [t]he Reports, debates, and hearings make abundantly clear that Congress intended the PDA to provide relief for working women and to end discrimination against pregnant workers. In contrast to the thorough account of discrimination against pregnant workers the legislative history is devoid of any discussion of preferential treatment of pregnancy, beyond acknowledgments of the existence of state statutes providing for such preferential treatment.
>
> [479 *U.S.* 272, 285–86, 107 *S.Ct.* 683, 692, 93 *L.Ed.*2d 613, 626–27 (1987).]

The PDA emphasizes a policy of equal treatment for women on the basis of pregnancy or related medical conditions, providing in pertinent part that

> [t]he terms "because of sex" or "on the basis of sex" include, but are not limited to, because of or on the basis of pregnancy, childbirth, or related medical conditions; and women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes.
>
> [42 *U.S.C.A.* § 2000e(k).]

The theme of equal, not preferential, treatment under the PDA has been underscored by the courts. *See Rhett v. Carnegie Center Assoc.,* 129 *F.*3d 290, 295 (3d Cir.1997), *cert. denied,* 524 *U.S.* 938, 118 *S.Ct.* 2342, 141 *L.Ed.*2d 714 (1998). *Rhett, supra,* held that "the PDA does not require that employers treat pregnant employees better than other temporarily disabled employees." 129 *F.*3d

at 295. In that matter, the employee was terminated while on maternity leave based on a reduction in force justified by economic conditions. *Id.* at 296. Because "the PDA 'requires the employer to ignore an employee's pregnancy, but ... not her absence from work, unless the employer overlooks the comparable absences of non-pregnant employees," the court held that the plaintiff's termination was not pregnancy discrimination. *Ibid.* (quoting *Troupe v. May Dep't Stores Co.,* 20 *F.*3d 734, 738 (7th Cir.1994)). *See also E.E.O.C. v. Lutheran Family Services,* 884 *F.Supp.* 1022, 1027–28 (E.D.N.C.1994).

Although distinguishable, the analysis from *Rhett* is nonetheless informative. Policy arguments may be advanced for mandating statutorily that employers provide for the possibility that pregnant employees may require enhanced leave to cover the panoply of medical needs that may arise during pregnancy. That, however, does not justify this Court's imposition of such a requirement on employers under the mantle of the LAD. To do so would constitute legislating a new minimum medical leave requirement. That we will not do. It is not for this Court to legislate our personal preferences in respect of leave policy for pregnant employees.

If an employer treats its pregnant employees no differently than comparable non-pregnant employees in need of extended medical leave, then the LAD is not transgressed. An employer's failure to provide enhanced leave allotments for its pregnant employees, who may require more time off than the employer's policy permits, does not constitute discrimination interdicted by the LAD. The LAD, like the PDA, prevents an employer from discriminating against an employee based on her pregnancy. *See, e.g., Gilchrist v. Bd. of Educ. of Haddonfield,* 155 *N.J.Super.* 358, 368–69, 382 *A.*2d 946 (1978) (holding in favor of employer because there was "no evidence to base a determination that the only temporary disability or absence being singled out by the Board was pregnancy, or, as a matter of fact, that any class, including gender-based classifications, was disadvantaged by the policy of Board [in respect of contract renewals]"). The LAD does not

require an employer to deviate for pregnant employees from the even-handed application of its medical leave policy that already provides more leave than any relevant federal or state statute requires.

In conclusion, we hold that an employer's adherence to such a medical leave policy does not constitute gender discrimination. We reject plaintiffs' argument that such a policy is discriminatory toward women simply because the termination of a woman's pregnancy disability is readily determinable, unlike other types of medical afflictions. We also respectfully disagree with our dissenting colleagues' characterization of all pregnancy-related health needs as, essentially, a gender-based classification that requires special accommodation to avoid the label of gender discrimination. It is the medical condition that requires the extended period of medical leave, and the need for extended medical leave also can arise for men, due to illnesses that are unique to their gender and also may exceed the limits of Hilton's policy. In short, this case is about preference in treatment, not equal treatment. Policy preferences are for the Legislature and it has expressed its leave requirements for family and pregnancy-related needs in the NJFLA. We discern no requirement in the LAD that preferential leave treatment for pregnant employees is necessary for an employer to avoid the accusation that it is impacting women as a class unequally. Christina's employment was terminated because she failed to return to work at the expiration of all applicable medical leave. We conclude that the Hilton policy is not discriminatory and, as far as the record discloses, Christina was not treated differently than anyone else under the policy.

## IV.

The finding of the trial court that the Hilton policy is discriminatory is reversed and the matter is remanded to the Law Division for further proceedings consistent with this opinion.

Chief Justice PORITZ, dissenting.

The majority holds that so long as an employer's medical leave policy applies equally to men and women (whether the employee's condition is pregnancy-based or otherwise), the New Jersey Law Against Discrimination, *N.J.S.A.* 10:5–1 to –42, is not violated. I cannot agree. In my view, the employer's facially neutral leave policy in this case results in a disparate impact on women such that gender discrimination must be found. However laudable the employer's intentions, pregnancy is unique to women. That biological fact requires us to examine whether an even-handed leave policy disadvantages women because they, and only they, will use leave for pregnancy-related conditions thereby limiting its availability for medical conditions generally, a limitation never faced by men. I would hold that an employer must reasonably accommodate the women in its workforce by extending leave for pregnancy when such leave is necessary for health reasons, unless the employer can demonstrate that business necessity prevents that accommodation.

## I.

The Law Against Discrimination (LAD) protects the "civil right" of "[a]ll persons ... to have the opportunity to obtain employment." *N.J.S.A.* 10:5–4. In furtherance of that right, *N.J.S.A.* 10:5–12 declares, in relevant part, that it is

an unlawful employment practice, or as the case may be, unlawful discrimination:

a. For an employer, because of the race, creed, color, national origin, ancestry, age, marital status, domestic partnership status, affectional or sexual orientation, genetic information, sex, disability or atypical hereditary cellular or blood trait of any individual, or because of the liability for service in the Armed Forces of the United States or the nationality of any individual, or because of the refusal to submit to a genetic test or make available the results of a genetic test to an employer, to refuse to hire or employ or to bar or to discharge or require to retire, unless justified by lawful considerations other than age, from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment....

When called on to interpret the LAD, our Court has emphasized the Legislature's broad remedial purpose as "nothing less than the

eradication of the cancer of discrimination," *Fuchilla v. Layman,* 109 *N.J.* 319, 334, 537 *A.*2d 652 (quoting *Jackson v. Concord Co.,* 54 *N.J.* 113, 124, 253 *A.*2d 793 (1969)), *cert. denied,* 488 *U.S.* 826, 109 *S.Ct.* 75, 102 *L.Ed.*2d 51 (1988), and has liberally construed the language of the statute to achieve that purpose. *Cedeno v. Montclair State Univ.,* 163 *N.J.* 473, 478, 750 *A.*2d 73 (2000). Although we have considered federal precedent in our quest for meaning, we have not hesitated to move beyond federal law when our own law and traditions require that we do so:

> In construing the terms of the LAD, this Court has frequently looked to federal precedent governing Title VII of the Civil Rights Act of 1964 (Title VII) as a key source of interpretative authority. Although the substantive and procedural standards that we have developed under the State's LAD have been markedly influenced by the federal experience, we have applied the Title VII standards with flexibility and have not hesitated to depart from federal precedent if a rigid application of its standards is inappropriate under the circumstances.
>
> [*Lehmann v. Toys 'R' Us, Inc.,* 132 *N.J.* 587, 600–01, 626 *A.*2d 445 (1993) (internal quotations and citations omitted).]

*See Viscik v. Fowler Equip. Co.,* 173 *N.J.* 1, 13, 16, 800 *A.*2d 826 (2002) (stating that "New Jersey Courts have traditionally sought guidance from the substantive and procedural standards established under federal law," but recognizing that "[t]he term 'handicapped' in LAD . . . has been interpreted as significantly broader than the analogous provision of the Americans with Disabilities Act").

In this case, we should adhere to our own law and traditions and look beyond the baseline set by the federal courts. We have always been vigilant in the protection of civil rights even when the Legislature has not yet addressed the precise form of discrimination before the Court. In doing so, we have not usurped a legislative function; rather, we have recognized the broad remedial purpose that animates the LAD and have interpreted the statute to give effect to that purpose. We have understood that the LAD, stripped to its essence, embodies a simple but powerful idea: that discrimination will not be tolerated in our society.

## II.

I approach the question before the Court with that idea as a guiding principle.

I begin by acknowledging that Hilton's medical disability policy is both generous and more than the law requires. Under that policy, employees are permitted twenty-six weeks of leave for any medical reason, including pregnancy;[1] any employee unable to return after twenty-six weeks is deemed to have resigned. Although those employees may reapply to Hilton, if rehired they lose seniority and any other carryover benefits that were available had the twenty-six weeks not been exceeded.

Plaintiff, Christina Gerety, was employed by Hilton from 1989 until she was discharged on April 2, 1998. Sometime around September 1997, she discovered that she was pregnant. Based on medical concerns related to her pregnancy, in October 1997, Christina sought disability leave. Christina's pregnancy-related medical problems continued with the result that she was absent for more than the 182 days (or twenty-six weeks) allowed under Hilton's family leave policy. Ultimately, because Hilton strictly enforced its policy, Christina was fired effective April 2, 1998. After she gave birth to twins on April 15, she would have been eligible for family leave under the New Jersey Family Leave Act, N.J.S.A. 34:11B-1 to -16, had the gap not occurred between Hilton's twenty-six-week leave period and the twins' birth (about thirteen days including Saturdays and Sundays). Christina therefore lost the opportunity to use family leave and to maintain her seniority.

Hilton's leave policy is facially neutral in that it treats men and women alike in respect of the number of days they are allotted for medical disability. Under the federal Pregnancy Discrimination

---

[1] *Amicus curiae* Employers Association of New Jersey has informed the Court that most employers in New Jersey provide the same generous leave "because New Jersey businesses commonly refrain from taking adverse action against an employee who is receiving temporary disability insurance benefits."

Act of 1978 (PDA), 42 *U.S.C.A.* § 2000e(k), discrimination based on pregnancy *is* sex discrimination.[2] *Cal. Fed. Sav. & Loan Ass'n v. Guerra,* 479 *U.S.* 272, 284, 107 *S.Ct.* 683, 691, 93 *L.Ed.*2d 613, 626 (1987). It states that "women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes ... as other persons not so affected...." 42 *U.S.C.A.* § 2000e(k). That does not mean, however, that states cannot provide different treatment for pregnancy-related conditions in the workforce context.

The United States Supreme Court has concluded that "Congress intended the PDA to be a floor beneath which pregnancy disability benefits may not drop—not a ceiling above which they may not rise." *Cal. Fed., supra,* 479 *U.S.* at 285, 107 *S.Ct.* at 691, 93 *L.Ed.*2d at 626 (internal quotations and citation omitted). In *California Federal, supra,* a California state agency found that under state law "California employers [had] to reinstate an employee returning from ... pregnancy leave to the job she previously held, unless it [was] no longer available due to business necessity," a benefit unavailable to men. *Id.* at 276, 107 *S.Ct.* at 687, 93 *L.Ed.*2d at 620. Justice Marshall framed the issue as "whether the PDA prohibits the States from requiring employers to provide reinstatement to pregnant workers, regardless of their policy for disabled workers generally," and decided that it did not. *Id.* at 284, 292, 107 *S.Ct.* at 691, 695, 93 *L.Ed.*2d at 625, 630; *see* Christine Neylon O'Brien & Gerald A. Mardek, *Pregnancy Discrimination and Maternity Leave Laws,* 93 *Dick. L. Rev.* 311, 326 (1989) (noting that as of 1989, thirteen states had pregnancy disability policies that fit within framework annunciated in *California Federal,* including California, Colorado, Connecticut, Hawaii, Illinois, Iowa, Kansas, Massachusetts, Montana, New Hampshire, Oregon, Tennessee, and Washington).

---

[2] By its reference to pregnant women with medical conditions as a "sub-subclass," the majority seems to suggest that any disparate impact on this group is not gender discrimination. *Ante* at 402–04, 877 *A.2d* at 1240. That is contrary to the PDA.

Although New Jersey does not have a statute that specifically requires accommodation for pregnancy-related medical conditions in addition to or apart from other conditions common to men and women alike, I would find that the LAD, interpreted broadly as we must, requires that accommodation. Given the Legislature's expressed concern about the pernicious effects of discrimination and the Legislature's numerous additions to the list of groups protected by the LAD,[3] and given our consistent liberal interpretation of the LAD, I would hold a facially neutral leave policy that has a disparate impact on women violative of *N.J.S.A.* 10:5–12(a).

That there is a disparate impact is obvious and self-evident. We do not need a statistical study or the marshalling of examples to tell us that only women will use their leave for pregnancy-related conditions and that, therefore, only women will need accommodation because of pregnancy-related conditions in order to even the playing field for men and women.[4] Indeed, this case is illustrative of that need. The facts graphically illustrate the disparate impact of Hilton's facially neutral leave policy: both Mr. and Mrs. Gerety work for Hilton; Mrs. Gerety carried the couple's children and Mr. Gerety kept his job. Indeed, *California Federal, supra,* points out that "[b]y taking 'pregnancy into account,' California[ ] . . . allows women, as well as men, to have families without losing their jobs." 479 *U.S.* at 289, 107 *S.Ct.* at 694, 93 *L.Ed.*2d at 629.

---

[3] During the period from 1945 to 2004, by a series of amendments to the statute, the Legislature substantially expanded its categories of concern in recognition of the pervasive nature of discrimination in our society. *See, e.g., L.* 1970, *c.* 80, § 14 (prohibiting discrimination on the basis of age, marital status, or sex); *L.* 1991, *c.* 519, § 8 (affectional or sexual orientation); *L.* 1992, *c.* 146, § 9 (familial status); *L.* 1997, *c.* 179, § 1 (genetic information).

[4] The majority points to testicular cancer as an example of "medical conditions that can strike only men and can create, similarly, the need for extended medical leave." *Ante* at 404, 877 *A.*2d at 1240. Under Hilton's policy, however, men and women suffer from conditions/diseases of their reproductive organs and men and women are given equal leave for treatment related to those conditions. Only women, however, suffer from pregnancy-related conditions.

## III.

It is important to understand that early efforts to address discriminatory policies were focused on equal treatment for pregnant women in the workplace. As Justice Marshall observed

> Title VII, as amended by the PDA, and California's pregnancy disability leave statute share a common goal. The purpose of Title VII is to achieve equality of employment opportunities and remove barriers that have operated in the past to favor an identifiable group of . . . employees over other employees.
>
> [*Id.* at 288, 107 *S.Ct.* at 693, 93 *L.Ed.*2d at 628 (internal quotations and citations omitted).]

Clearly, barriers that limit opportunities for women favor men who are not similarly limited.

In rejecting a claim of disparate treatment in *Castellano v. Linden Board of Education,* 79 *N.J.* 407, 412, 400 *A.*2d 1182 (1979), our Court held that a mandatory one-year maternity leave policy contained in a collectively negotiated agreement between the Linden Board of Education and the teachers' union violated the LAD. In that case, the plaintiff teacher, Sandra Castellano, gave birth in August and informed the Board that she wished to return to her position in late September. *Id.* at 408, 400 *A.*2d 1182. She was required to take the one-year mandatory maternity leave of absence, however, and was not permitted to apply her accumulated sick leave during that period. *Ibid.* The Court found that "[i]n purpose and effect, [the policy] discriminate[d] against teachers because of their sex," distinguishing *Gilchrist v. Board of Education of Haddonfield,* 155 *N.J.Super.* 358, 382 *A.*2d 946 (App.Div.1978), where a pregnant teacher's contract was not renewed under a "continuity of instruction" policy that applied to all teachers alike regardless of the reason for absence. *Castellano, supra,* 79 *N.J.* at 412, 400 *A.*2d 1182. In considering the same argument put forward by the Linden Board, we stated: "We agree that the continuity concept is a legitimate goal for the Board to consider. However, it cannot be adhered to blindly at the expense of the civil rights of teachers." *Ibid.*

In 1979 we were concerned about a policy that openly placed women at a disadvantage. We implicitly accepted a policy that would have a disparate impact in *Gilchrist, supra,* because it was neutral on its face but warned that the employer's justification, although legitimate, would not always win the day. *Castellano, supra,* 79 *N.J.* at 412, 400 *A.*2d 1182.

This case is not about preferential treatment, as the majority claims. If men and women were both capable of becoming pregnant, women could not be treated differently under equality guarantees. Because men cannot become pregnant, however, employers "can penalize workers on account of their pregnancies with impunity." Judith G. Greenberg, et al., *Women in the Law* 99 (2d ed. 1998). I believe that we have reached a point when that result is no longer acceptable.

I would find in this case that the practice of the employer results in a disparate impact on women and remand to the trial court for Hilton to demonstrate, if it can do so, that its policy is both job-related and required by business needs.[5] If Hilton cannot make that showing, I would require that it administer its leave policy in a flexible manner so as reasonably to accommodate women in Christina Gerety's position.

---

[5] The federal analogue to this approach, which I follow, is the burden of proof in disparate impact cases, found at 42 *U.S.C.A.* § 2000e–2(k). It states that

> An unlawful employment practice based on disparate impact is established only if
> (a) a complaining party demonstrates that a respondent uses a particular employment practice that causes a disparate impact on the basis of race, color, religion, sex, or national origin and the respondent fails to demonstrate that the challenged practice is job related for the position and consistent with business necessity …
> [*Id.* at § 2000e–2(k)(1)(A)(i).]

*See also* 29 *C.F.R.* § 1604.10(c) (providing that "Where the termination of an employee who is temporarily disabled is caused by an employment policy under which insufficient or no leave is available, such termination violates the Act [Title VII] if it has a disparate impact of employees of one sex and is not justified by business necessity").

## IV.

For all of the foregoing reasons, I would modify and affirm the trial court's determination denying summary judgment to defendant Hilton.

Justices LONG and ZAZZALI join in this opinion.

*For reversal and remandment*—Justices LaVECCHIA, ALBIN, WALLACE and RIVERA–SOTO—4.

*For modification and affirmance*—Chief Justice PORITZ and Justices LONG and ZAZZALI—3.